United States Court of Appeals,

Fifth Circuit.

No. 94-20774.

Jerome P. ALBERTO, et al., Plaintiffs-Appellants,

and

Roderick Earl Hall, et al., Movants-Appellants,

v.

DIVERSIFIED GROUP, INC., et al. Defendants,

Diversified Group, Inc., Defendants-Appellees.

Stephen C. CRAWFORD, Plaintiff-Appellant,

v.

DIVERSIFIED GROUP, INC., Defendant-Appellee.

June 21, 1995.

Appeal from the United States District Court for the Southern District of Texas.

Before DAVIS, SMITH and WIENER, Circuit Judges.

WIENER, Circuit Judge:

Plaintiffs-Appellants Jerome P. Alberto, et al. (Alberto et al.), judgment creditors of Johnson-Logins, Inc. (JL), appeal a summary judgment granted in favor of Diversified Group, Inc. (DGI), arguing that the district court erred in deciding to apply the substantive law of Delaware, and in concluding under Delaware law that DGI and JL were not alter egos and thus that DGI could not be held liable for the debts of JL. Finding no reversible error, we affirm.

I

FACTS AND PROCEEDINGS

Alberto et al., a group of 143 individuals each of whom was a homeowner in one of three subdivisions in Texas (the "Atascocita Properties), filed suit against DGI, a shareholder in JL (and in another corporation which held JL stock), seeking to hold DGI liable for default judgments previously entered against JL totalling more than $58 million. Alberto et al. had obtained those

judgments in state court tort suits in which they had alleged that the foundations of their homes failed as a result of soil subsidence. JL, one of the original owners and developers of the properties, was a defendant in those suits. JL had filed for Chapter 7 protection before the tort suits were commenced, but the bankruptcy court lifted the automatic stay to permit the plaintiffs to pursue their claims against JL in Texas state court.

JL had been incorporated in the early 1970s under the laws of Delaware as a wholly owned subsidiary of First Realty Development Corporation (First Realty). By the mid-70s, JL had begun to lose money, and First Realty decided to sell the company. First Realty contacted DGI (at that time IDSO Investments, Inc., a holding company incorporated under Louisiana law in 1967 by H.D. Hughes (Hughes) and his wife, Ida) to determine whether DGI was interested in the acquisition.

DGI claims that even though JL was losing money at that time, DGI decided to invest in the company in the belief that the fair market value of JL's real estate holdings was higher than their book value. Alberto et al. dispute this contention, contending that Hughes acquired JL solely to use its tax losses as offsets against the taxable earnings of DGI's profitable subsidiary corporations. In any event, DGI agreed to purchase an interest in JL.

To facilitate the acquisition of such an interest, a new corporate entity, Z Corporation, was formed in Texas. The purchase of JL was structured so that Z Corporation would own all of JL's stock, and the stock in Z Corporation, in turn, would be shared by DGI and several other investors. DGI insists that it structured the acquisition in this manner because it did not want to acquire 100% of JL and therefore needed a "common currency," *i.e.,* stock in Z Corporation, to accommodate the interests of the various investors. DGI explains that Ken Watler and Leon Dorsey, two of the investors in JL, exchanged stock in another company, Weatherby Engineering Company, for stock in Z Corporation, while some of First Realty's stockholders who had acquired JL stock in a spin out exchanged it for stock in Z Corporation. Alberto et al. dispute this contention as well, contending that Hughes formed Z Corporation as a shell to insulate himself and DGI from JL's liabilities.

Pursuant to the purchase agreement, DGI, through Z Corporation, immediately contributed $2.4 million to JL's existing capitalization and agreed to advance another $2 million as required. This

capital infusion was insufficient to remedy JL's dire financial condition, however, and not long after Z Corporation acquired JL, one of JL's creditors effectively took over the operations of JL and proceeded to wind down the company's affairs. By September 1978, that creditor had substantially completed the winding down of JL and relinquished control of the company.[1] Soon thereafter, JL authorized the issuance of 250 new shares and sold those shares to DGI, as a result of which JL stock was owned 20% by DGI and 80% by Z Corporation. As DGI then owned 63% of the issued and outstanding stock in Z Corporation, DGI held beneficial ownership in 70.4% of JL.[2] By this time, Hughes had become the sole director of DGI, Z Corporation, and JL.

JL had owned an interest in the Atascocita Properties in the mid-1970s, long before the company was acquired by Z Corporation. JL, however, did not finally dispose of the last of its interests in the properties in those subdivisions until November 1978—about a week after DGI acquired its 20% direct stock ownership in JL. DGI insists that it had nothing to do with JL's sale of its last remaining interest in the subdivisions. Moreover, none of the 143 individual plaintiffs comprising Alberto et al. purchased their properties until the 1980s—years *after* JL had completed its disposal of all interest in the Atascocita Properties and had been substantially wound down.

Alberto et al. originally filed suit in Texas state court seeking a declaratory judgment that DGI was liable for the judgments against JL on the theory that JL and DGI are alter egos. DGI removed the suit to federal court on grounds of diversity and filed a motion for summary judgment. The district court granted summary judgment in favor of DGI based on the finding that JL and DGI are not alter egos under Delaware law. This finding was grounded in the failure of Alberto et al. to

---

[1]The creditor, First City National Bank of Houston (FCNB), had demanded that (1) JL be liquidated, (2) one of FCNB's representatives, Reuben Askanase, be installed as CEO and Chairman of JL's Board of Directors, (3) JL increase its capital stock from 1000 to 1250 shares and issue the 250 new shares to Askanase, and (4) Askanase be given an irrevocable proxy over the remaining 1000 shares. JL complied with all of FCNB's demands, thereby diminishing Z Corporation's interest in JL to 80%. Askanase proceeded to wind down JL's business, he sold the majority of JL's assets, used that money to reduce JL's liabilities, had fired all of JL's employees, and closed JL's office. After Askanase had, for the most part, completed JL's wind down, he resigned from the company and his shares were canceled.

[2]DGI controlled 83% of the voting power in Z Corporation, giving it 86.4% of the voting power in JL.

proffer evidence from which a reasonable factfinder could find that recognition of JL and DGI as separate corporate entities would result in unfairness or injustice.

Alberto et al. filed a motion for reconsideration, which the court denied, and this appeal followed. On appeal, Alberto et al. contend that the district court erred in concluding that (1) the substantive law of Delaware, rather than Louisiana, applies; and (2) under Delaware law DGI is entitled to summary judgment due to the failure of Alberto et al. to proffer summary judgment evidence of overall injustice or unfairness.

## II

## ANALYSIS

### A. CHOICE OF LAW

As this suit was removed to the district court on the basis of diversity jurisdiction, the district court had to apply the conflict of laws rule of the state in which it sits to determine which state's substantive law should be applied.[3] The district court, sitting in Texas, applied Texas' conflicts rule on choice of law, and concluded that the substantive law of Delaware should be applied. We agree.

Under Texas law,

[O]nly the laws of the jurisdiction of incorporation of a foreign corporation shall govern ... (2) the liability, if any, of shareholders of the foreign corporation for the debts, liabilities, and obligations of the foreign corporation for which they are not otherwise liable by statute or agreement.[4]

Alberto et al. are seeking to enforce the judgment debts of JL, a Delaware corporation, against DGI, both a direct and indirect shareholder of JL stock. Applying the plain language of the statute, therefore, the liability of DGI, as shareholder of a foreign corporation, *i.e.,* JL, is governed "only [by] the laws of the jurisdiction of [JL's] incorporation," which, in this case, is Delaware. We agree with the district court that "it is clearly the intent of the statute to apply the laws of the jurisdiction of incorporation of the foreign corporation [JL], not the laws of the jurisdiction of a shareholder [DGI]."

Alberto et al. claim that the district court erred in its analysis, urging that the *Restatement*

---

[3]*Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941).

[4]TEX.BUS.CORP.ACT.ANN. art. 8.02 (West Supp.1994).

*(Second) of Conflict of Laws,* our decision in *United States v. Clinical Leasing Service, Inc.,*[5] and a decision of a district court sitting in Delaware all support the proposition that the correct choice of law is the substantive law of the state of incorporation of the parent/shareholder (DGI), rather than the state of incorporation of the subsidiary (JL). As DGI is a Louisiana corporation, Alberto et al. argue, the district court should have applied the substantive law of Louisiana, not Delaware. We are not persuaded.

*Restatement (Second) of Conflict of Laws* § 306, "Liability of Majority Shareholder," provides that:

> [t]he obligations owed by a majority shareholder to the corporation and to the minority shareholders will be determined by the local law of the state of incorporation, except in the unusual case where, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the parties and the corporation, in which event the local law of the other state will be applied.[6]

Alberto et al. insist that this is just such an "unusual case," requiring application of the substantive law of Louisiana—the state with a "more significant relationship" than Delaware.[7] But § 306 does not apply here, as (1) it addresses only "obligations owed by a majority shareholder *to the corporation and to the minority shareholders* " (not to creditors, such as Alberto et al.), and (2) it applies only "in the absence of an applicable local statute"[8]—but this issue *is* governed by such a local statute, *Texas Business Corporation Act* article 8.02.

Neither do *Clinical Leasing Service*[9] or *Mobil Oil Corporation v. Linear Films, Inc.*[10] persuade us to ignore the plainly applicable Texas statute. *Clinical Leasing Service* was brought in

---

[5]892 F.2d 900 (5th Cir.1992).

[6]RESTATEMENT (SECOND) CONFLICT OF LAWS § 306.

[7]Alberto et al. argue that DGI was the majority shareholder as it dominated and controlled Z Corporation. For the limited purposes of addressing their conflict of laws argument, we assume without deciding that Alberto et al. could prove that DGI and Z Corporation were alter egos, resulting in DGI having the majority interest in JL.

[8]*Id.* § 306 cmt. c.

[9]982 F.2d 900 (5th Cir.1992).

[10]718 F.Supp. 260 (D.Del.1989).

a federal district court in Louisiana, so Louisiana's choice-of-law rules—not those of Texas—were at issue. Moreover, the parties "agree[d]" that Louisiana law provided the rule of decision, so choice of law was not at issue.[11] *Mobil Oil Corporation* is also inapposite, as jurisdiction in that case was based on a federal question, not diversity. And, as in *Clinical Leasing Service,* the court avoided the conflict of laws issue entirely, stating that, "[the court] is convinced that regardless of which law is applied to the alter ego question—whether federal, Delaware or Oklahoma common law—the outcome is the same."[12] In short, we are convinced that here the district court was correct in applying Texas' conflict of laws statute and in concluding that under the Texas statute, Delaware's substantive law governs this dispute.

B. PIERCING THE CORPORATE VEIL

Not to be deterred, Alberto et al. argue that even under Delaware law the district court erred in granting summary judgment in favor of DGI based on its conclusion that Alberto et al. failed to proffer sufficient summary judgment evidence to support a finding that DGI and JL were alter egos. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[13]

Under Delaware law, numerous factors are pertinent to an alter ego analysis, but " "no single factor [can] justify a decision to disregard the corporate entity.' "[14]

> "These factors include whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder."[15]

---

[11]*Clinical Leasing Serv.,* 982 F.2d at 902 n. 5.

[12]*Mobil Oil Corp.,* 718 F.Supp. at 268.

[13]FED.R.CIV.PRO. 56(c).

[14]*Harco Nat'l. Ins. Co. v. Green Farms, Inc.,* No. 1131, 1989 WL 110537, at *5 (Del.Ch. Sept. 19, 1989) (quoting *United States v. Golden Acres, Inc.,* 702 F.Supp. 1097, 1104 (D.Del.1988), *aff'd,* 879 F.2d 860 (3d Cir.1989)).

[15]*Id.* (quoting *Golden Acres, Inc.,* 702 F.Supp. at 1104).

The uncontroverted summary judgment proof establishes that several of these factors, both pro and con, were present here: (1) JL sold the Atascocita Properties pursuant to a creditor's order to wind down business; (2) JL was substantially wound down by 1978, when it was acquired by Z Corporation; (3) JL was undercapitalized before Z Corporation ever purchased it; (4) DGI, through Z Corporation, periodically infused capital into JL; (5) JL and DGI kept separate books and records[16]; and (6) JL, Z Corporation, and DGI shared common officers and directors only after 1978, by which time JL had been substantially wound down. Although some of these factors might militate in favor of a finding of alter ego, most do not. More significantly, one element that is essential under Delaware law is palpably absent: injustice or unfairness.

Delaware law makes clear that to pierce the corporate veil on an alter ego theory, a plaintiff must demonstrate a "misuse" of the corporate form[17] or " "an overall element of injustice or unfairness.' "[18] This is because Delaware courts of chancery will not disregard the corporate form of a subsidiary unless equity so demands.[19] Although this equitable power is "broad"[20] and can be

---

[16]Alberto et al. point to the fact that some of JL's records were apparently missing to argue that there is a fact issue whether the companies maintained separate books and records. The lack of some corporate records raises an issue of the adequacy of JL's records, but is not probative whether JL and DGI maintained separate books and records.

[17]*Irwin & Leighton, Inc. v. W.M. Anderson Co.,* 532 A.2d 983, 989 (Del.Ch.1987) ("[T]he cases inevitably tend to evaluate the specific facts with a standard of "fraud' or "misuse' or some other general term of reproach in mind.").

[18]*Harco Nat'l Ins. Co.,* 1989 WL 110537 at *5 (quoting *Golden Acres, Inc.,* 702 F.Supp. at 1104); *see Sears, Roebuck & Co. v. Sears plc,* 744 F.Supp. 1297, 1304 (D.Del.1990) ("In order to reach a parent corporation under the alter-ego theory, the plaintiff must show fraud, injustice, or inequity in the use of the corporate form."); *Mobil Oil Corp.,* 718 F.Supp. at 269 ("The law requires that fraud or injustice be found in the defendant's use of the corporate form."); *cf. In re Sims,* 994 F.2d 210, 218 n. 11 (5th Cir.1993) (noting that to pierce corporate veil, "Delaware requires "fraud or something like it' "), *cert. denied,* --- U.S. ----, 114 S.Ct. 702, 126 L.Ed.2d 669 (1994).

[19]*Pauley Petroleum, Inc. v. Continental Oil Co.,* 239 A.2d 629, 633 (Del.1968) (observing that corporate entities as between parent and subsidiary may be disregarded "only in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or where equitable consideration among members of the corporation require it are involved."); *see Harper v. Delaware Valley Broadcasters, Inc.,* 743 F.Supp. 1076, 1085 (D.Del.1990) (noting that Delaware courts "will not disregard separate legal entities absent a showing that equitable considerations require such action"), *aff'd,* 932 F.2d 959 (3d Cir.1991); *Mobil Oil Corp. v. Linear Films, Inc.,* 718 F.Supp. 260, 271 n. 15 (D.Del.1989) (rejecting "notion that a parent company can be held liable for the obligations of a subsidiary purely on the basis of dominion and

invoked whenever justice demands,[21] Delaware courts "require[ ] a strong case to induce a court of equity to consider two corporations as one."[22]

Thus Delaware distinguishes the equitable remedy of piercing the corporate veil from the legal concept of "agency," which under Delaware law does not require a finding of injustice or inequity.[23] The requirement that an overall element of injustice or inequity be proved also distinguishes Delaware's equitable veil-piercing standard from federal alter ego law, under which a finding of injustice or inequity is necessary in cases sounding in contract, but not in those sounding in tort.[24] Consequently, any reliance on cases applying federal alter ego law would be misplaced.

As we have noted, the district court granted DGI's motion for summary judgment based on the conclusion that Alberto et al. failed to adduce proof from which a reaso nable factfinder could conclude that an overall element of injustice or unfairness would result if the separate corporate existence of JL and DGI were to be recognized. Our review therefore is limited to the narrow issue

control, without an additional finding of fraud or injustice in using the corporate form.").

[20]*See Golden Acres, Inc.,* 702 F.Supp. at 1104 (opining that "Delaware test for piercing the corporate veil" is "broader" than federal analysis); *Martin v. D.B. Martin Co.,* 10 Del.Ch. 211, 215, 102 A. 373 (1913) (stating that corporate fiction will "never [be] resorted to when it would work an injury to any one").

[21]*See Pauley Petroleum, Inc.,* 239 A.2d at 633 (corporate entities as between parent and subsidiary may be disregarded "only in the interest of justice"); *see, e.g., Warren v. Warren,* 460 A.2d 526, 528 (Del.1983) (affirming chancellor's decision to disregard corporate veil, in direct contravention of remedy provide by law, "for the limited purpose of fashioning an appropriate remedy").

[22]*Martin,* 10 Del.Ch. at 214, 102 A. 373; *accord Harco Nat'l Ins. Co.,* 1989 WL 110537 at *4 (stating that to persuade "a Delaware Court to disregard the corporate entity is a difficult task").

[23]*J.E. Rhoads & Sons, Inc. v. Ammeraal, Inc.,* No. 83C-NO-95, 1988 WL 32012, at *6 (Del.Super.Ct. Mar. 30, 1988) (discussing differences between legal and equitable claims); *see Mobil Oil Corp.,* 718 F.Supp. at 271 n. 15 (discussing legal and equitable remedies under Delaware law). Alberto et al. cannot prevail under the legal theory of agency, however, as the record makes clear that there is no "close connection between the relationship of the two corporations and the cause of action." *Sears, Roebuck & Co.,* 744 F.Supp. at 1305.

[24]*Compare United States v. Jon-T Chems.,* 768 F.2d 686, 692 (5th Cir.1985) (stating that "in contract cases[,] fraud is an essential element of an alter ego finding[,]" but "we do not require a finding of fraud in tort cases"), *cert. denied,* 475 U.S. 1014, 106 S.Ct. 1194, 89 L.Ed.2d 309 (1986) *with Mobil Oil Corp.,* 718 F.Supp. at 267 (requiring showing of "fraud or something in the nature of fraud" to hold parent liable for torts of subsidiary based on alter ego theory).

whether a Delaware court would agree that Alberto et al. did not proffer sufficient summary judgment evidence of injustice or unfairness to clear the summary judgment hurdle. In this regard, Alberto et al. purport to identify two injustices that would go unavenged should we not disregard the separate corporate forms of JL and DGI.

1. *Undercapitalization*

The primary equitable argument made by Alberto et al. is that it would be unfair to recognize JL's separate corporate form because that company was undercapitalized from the time it was purchased for DGI and others by Z Corporation until JL went bankrupt. Alberto et al. point out that, when determining whether to pierce a corporate veil, "[o]f all the [ ] factors ... the one "that all the authorities consider significant in the inquiry, and part icularly in the case of ... a closely held corporation' is inadequate capitalization."[25]

Although Alberto et al. are factually correct that JL was undercapitalized from purchase to bankruptcy, we cannot agree that this truth provides the necessary proof from which a reasonable factfinder could find the existence of an overall element of injustice or unfairness. The record makes clear that when JL was acquired it was already in desperate financial straits and had been for some time. Pursuant to the purchase agreement, DGI and its fellow investors in Z Corporation infused $2.4 million of new capital into JL and obligated themselves to advance up to $2 million more. Thus, this is not a case in which a parent failed to capitalize its corporate offspring from its inception; neither is it a case in which the parent subsequent ly siphoned off the economic lifeblood of its subsidiary, thereby depriving creditors of the subsidiary's assets. Indeed, precisely the opposite is true.

Here, the subsidiary, JL, was not bled white for the benefit of its new "grandparent," DGI; to the contrary, DGI, through Z Corporation, attempted to resuscitate JL by funnelling millions of dollars of capital into the struggling company. In fact, Alberto et al. concede that JL was able to survive as long as it did only because of constant financial transfusions from DGI. Under these circumstances, we fail to see that any unfairness or injustice would result by honoring JL's separate

---

[25]*United States v. Golden Acres, Inc.,* 702 F.Supp. 1097, 1104 (D.Del.1988) (quoting *DeWitt Truck Brokers v. W. Ray Flemming Fruit Co.,* 540 F.2d 681, 685 (4th Cir.1976)), *aff'd,* 879 F.2d 860 (3d Cir.1989).

corporate existence merely because DGI's honored commitment to infuse more than $4 million into JL ultimately proved to be too little and too late to prevent JL's corporate ship from sinking. On the contrary, failure to recognize the separate corporate existences of DGI and JL would be far more inequitable: It would indeed be an ironic injustice to hold DGI liable for JL's debts merely because DGI's substantial funding efforts to save JL from its impending bankruptcy were unavailing.[26] We therefore decline Alberto et al.'s invitation to disregard the separate corporate existences of JL and DGI; we opt instead to let DGI's good deeds go unpunished.

2. *Income Tax Write-Offs*

Alberto et al. also perceive some inequity in an alleged dispute between DGI and JL over which company could write off some $3.3 million of JL's losses. But by attribution DGI owned eighty percent of JL and quite properly employed consolidated financial statements and consolidated tax returns for itself and its subsidiaries, including JL. We are satisfied that there is nothing improper, much less unfair or unjust, in DGI's inclusion of JL's losses in those consolidated tax returns to offset income from other, profitable corporations owned by DGI.

Nevertheless, Alberto et al. complain that, as DGI acquired JL merely as a tax write-off, equity demands that DGI be held liable for JL's debts. We discern nothing inequitable about acquiring a business that has tax losses for the purpose of using such losses to offset the profits of other concerns. As the Tenth Circuit observed in a similar context:

> The Internal Revenue Code allows a parent corporation to file consolidated income tax returns with its subsidiaries when the parent owns at least eighty percent of the subsidiary. Section 1501 allows a parent corporation to shelter taxable income from a profitable subsidiary by offsetting it against losses from an unprofitable subsidiary. It is a common business practice.[27]

3. *Other Inequities*

In addition to reviewing these two purported inequities, we have scoured the record for any

---

[26]*Compare Edwards Co. v. Monogram Indus., Inc.,* 730 F.2d 977, 984 (5th Cir.1984) (en banc) (concluding that subsidiary was not undercapitalized vis-a-vis parent when parent poured over $2 million into subsidiary).

[27]*Lowell Staats Mining Co. v. Pioneer Uravan, Inc.,* 878 F.2d 1259, 1265 (10th Cir.1989) (citations omitted).

other wrongdoings or inequities, either separate or in combination, but have found none. Although Alberto et al. are understandably disappointed that some of their judgments against JL may go unpaid, that is clearly not the kind of unfairness or injustice that will satisfy Delaware law and provoke disregard of the corporate form.[28] Rather, this is truly nothing more than an effort by Alberto et al. to find a deep pocket from which to recover on their judgments against a defunct judgment debtor.

In sum, the district court erred neither in applying Delaware's substantive law nor in finding, under that law, that Alberto et al. failed to produce sufficient summary judgment evidence from which a reasonable factfinder could find an overall element of injustice or unfairness. As such a finding is an indispensable prerequisite to piercing the corporate veil under Delaware law, the district court's grant of summary judgment in favor of DGI is

AFFIRMED.

---

[28]*Mobil Oil Corp.,* 718 F.Supp. at 268 (noting that "any tort—such as patent infringement—is, in some sense, an injustice" but "the underlying cause of action does not support the necessary fraud or injustice").