**John W. WEAVER, Liquidating Trustee, Appellant–Cross Appellant,**

v.

**AQUILA ENERGY MARKETING, CORPORATION, Appellee–Cross Appellant.**

**Civil Action No. H–95–4785.**

United States District Court, S.D. Texas, Houston Division.

May 20, 1996.

Daniel H. Johnston, Jr., Brown Parker & Leahy, Houston, TX, for John W. Weaver.

Joel P. Kay, Sheinfeld Maley & Kay, Houston, TX, for Trans Marketing Houston, Inc.

H. DeWayne Hale, Hale Trust Aston Seckel & Taubenfeld, PC, Dallas, TX, Douglas F. Pedigo, Omaha, NE, for Aquila Energy Marketing Corporation.

U.S. Bankruptcy Clerk, U.S. Bankruptcy Clerk's Office, Houston, TX, amicus curiae.

William R. Greendyke, Houston, TX, amicus curiae, pro se.

## MEMORANDUM OPINION

HOYT, District Judge.

Pending before the Court is the appeal of John W. Weaver, Liquidating Trustee (the "Trustee"), the cross-appeal of Aquila Energy Marketing Corporation ("Aquila"), and Aquila's request for oral arguments. The appeals come to this Court after a final judgment was entered in a core proceeding, pursuant to the Bankruptcy Act of 1978 (the "Code"), 28 U.S.C. § 157, et al. This Court has jurisdiction pursuant to 28 U.S.C. § 158(a).

The Trustee brought the original cause of action against Aquila to avoid an alleged "preferential transfer." The bankruptcy court found that no preferential transfer had occurred because neither Aquila nor the estate would benefit from the actions taken by Aquila. Having considered the briefs, the record, and the applicable law, the Court Reverses in part the bankruptcy court's judgment and Renders Judgment for the Trustee.

## BACKGROUND

### The Facts

The following facts are undisputed. In early 1992, Aquila sold natural gas to Trans Marketing Houston, Inc. ("TMHI") on an unsecured or open account basis. However, TMHI never paid for the gas.

On or about March 17, 1993, Aquila filed a sworn garnishment application in state court directed against Banque Paribus (the "Bank"), TMHI's primary lender and largest secured creditor. The writ was sought in conjunction with Aquila's lawsuit also filed in state district court and seeking $1,832,538.12. The state district court issued the writ of garnishment on March 23, 1993, and the writ was served on the Bank on March 25, 1993. At the time the writ was served, TMHI had on deposit funds in excess of the $1.8 million.

On April 1, 1993, the Bank, notwithstanding the writ, applied the entire balance in TMHI's account against debts owed to it. The Bank did not send any written notices or declarations to TMHI that it's loans were in default, or that the loans were subject to acceleration before exercising the setoff.

On April 11, 1993, TMHI filed for protection under chapter 11 of the Bankruptcy Code. While under bankruptcy protection, TMHI filed an action as debtor-in-possession seeking to avoid Aquila's writ of garnishment as a preferential transfer under 11 U.S.C. § 547(b).

Aquila has not recovered a judgment on its lawsuit or writ but did file a proof of claim with the bankruptcy court in the amount of $3,442,282.26. Of this amount, $1,832,538.12 is claimed by Aquila to be secured by reason of its prejudgment writ that was served on the Bank prior to TMHI's bankruptcy.

### The Bankruptcy Proceedings and the Confirmation Plan

On January 9, 1994, the bankruptcy court confirmed the second amended liquidating plan formulated by the official creditors' committee. The plan called for the creation of a trust to take over all of TMHI's assets. In addition, it stayed the state court proceed-ings. Another key provision of the plan required the Trustee to prosecute TMHI's avoidance action to a final judgment.

Aquila objected to confirmation of the liquidation plan. The objection was based, in part, on the plan's provisions requiring the Trustee to pursue the avoidance action. Aquila argued that the pursuit of that action would only benefit the Bank, not TMHI's unsecured creditors. Also, Aquila argued that the plan deprived it of the right to pursue its state court action.

Notwithstanding Aquila's objection, the plan was confirmed after an evidentiary hearing. Aquila appealed the confirmation order to this Court, which dismissed the appeal as moot because the plan had been substantially consummated under 11 U.S.C. § 1127(b). The Fifth Circuit affirmed this Court's judgment of dismissal.

## DISCUSSION AND AUTHORITY

### I. The Trustee's Appeal

The Trustee takes issue with the bankruptcy court's finding that no preferential transfer occurred. He contends that a transfer occurred at the moment of service of the writ of garnishment, converting Aquila's unsecured claim into a secured claim. Further, the Trustee contends that as a secured creditor, Aquila will receive more than it would have as an unsecured creditor. In addition, the Trustee argues that it is not necessary that the estate benefit from an avoidance of the transfer and, even if such a showing were necessary, he has shown such a benefit. Therefore, according to the Trustee, Aquila's garnishment lien is avoidable because it amounts to a preference.

### A. Section 547(b) [1] Preference Action

A "preference" is a transfer of a debtor's assets, during a specified pre-bankruptcy period, that unjustifiably favors the transferee over other creditors. *See 4 Collier on Bankruptcy* § 547.01 at 547–14 (15th ed.1996) ("*Collier* 15th ed."). The preference section of the Bankruptcy Code permits the bankruptcy trustee to "avoid any transfer of

1. All section references are to the Bankruptcy Code unless otherwise stated.

property" made (1) to a creditor, (2) on account of an antecedent debt, (3) while the debtor was insolvent, (4) 90 days before the bankruptcy filing, and (5) that enables the creditor to receive a larger share of the estate than if the transfer had not been made. 11 U.S.C. § 547(b).

In the case at bar, conditions one through four were either uncontested or decided in favor of the Trustee. At issue is condition five—whether a transfer occurred enabling Aquila to receive a larger share of the estate than it would have had if no transfer occurred.

### 1. Transfer of Property

■ The Court must first determine whether a transfer of property took place by service of the writ of garnishment prior to TMHI seeking bankruptcy protection. This inquiry raises a question of law; therefore, it will be reviewed de novo. See Chase Commercial Corp. v. Donald Benson Accessories, Inc., 69 B.R. 32 (N.D.Tex.1986) (reviewing a transfer by service of writ of garnishment under de novo standard).

■ Case law interpreting § 547(b) defines a transfer and determines when a transfer is complete. In re Kaufman, 187 B.R. 167, 170 (Bankr.E.D.La.1995); see also Barnhill v. Johnson, 503 U.S. 393, 397, 112 S.Ct. 1386, 1389, 118 L.Ed.2d 39 (1992). The term "transfer" is defined broadly to include "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest." 11 U.S.C. § 101(41). This definition has been interpreted to include garnishment liens. In re Conner, 733 F.2d 1560, 1562 (11th Cir.1984).

■ The Code provides that a transfer is .complete when it is "perfected". In re Conner, 733 F.2d at 1562; 11 U.S.C. § 547(e)(2)(A)–(B). "For property other than realty, the transfer is perfected 'when a creditor on a simple contract cannot acquire a judicial lien that is superior to the interest of the transferee.'" In re Conner, 733 F.2d at 1562 (quoting 11 U.S.C. § 547(e)(1)(B)). Thus, a transfer is effective when a creditor acquires rights in the debtor's property superior to similarly situated creditor. See 11 U.S.C. § 547(e)(3).

■ The term "property" or "interest in property" is not defined in the Code. In re Kaufman, 187 B.R. at 170. Therefore, courts must look to state law to determine what constitutes property and when property interests are acquired. Id.; see also Barnhill, 503 U.S. at 398, 112 S.Ct. at 1389.

■ Texas courts define the term "property" broadly. A Texas appeals court stated:

Courts have variously defined the word "property" as signifying the physical corporeal thing, or denoting rights and interest. It may reasonably be construed to include obligations, rights and other intangibles, as well as physical things; and thus the word "property" means not only the thing possessed, that is, the physical corporeal thing, but also rights in the physical corporeal thing which are created and sanctioned by law. The word "property" embraces everything which is or may be the subject of ownership, whether a legal ownership, or whether beneficial, or a private ownership. 73 C.J.S. Property § 1, pp. 140–141.

Davis v. Davis, 495 S.W.2d 607, 611 (Tex. App.1973).

■ Following these principals, courts have held that a transfer of property by garnishment occurs at the moment of service. E.g., In re Latham, 823 F.2d 108, 110 (5th Cir.1987) (per curiam); United States v. Standard Brass & Manufacturing Co., 266 S.W.2d 407, 408 (Tex.App.1954). At that moment, the garnishor acquires "rights in the physical corporeal thing" that he did not have before service. He becomes a secured creditor. See Chase Commercial Corp., 69 B.R. at 34 (supporting proposition that a garnishor becomes a secured creditor upon service of writ).

■ It, therefore, follows that a transfer of property interest took place before TMHI filed for bankruptcy. The writ of garnishment was issued on March 23, 1993, and served on March 25, 1993. TMHI filed for bankruptcy on April 11, 1993. Also, it is undisputed that TMHI was indebted to Aqui-

la in an amount certain at the time the writ was served. Thus, Aquila held a valid, perfected lien as of the date of service of the writ. No party could receive a judicial lien superior to Aquila's interest after service. The transfer of property interest, i.e., the conversion of Aquila's interest from unsecured to secured status, occurred on the date of service, the Bank's setoff notwithstanding.

A recent Seventh Circuit Court of Appeals' case calls into doubt the proposition that a transfer occurs at the moment a writ of garnishment is served. *See In re Freedom Group, Inc.*, 50 F.3d 408 (7th Cir.1995). In *In re Freedom Group*, a bankrupt company brought an action to avoid a preferential transfer resulting from a judicial seizure of its account. 50 F.3d at 409. The issue on appeal was whether a transfer occurred during the 90–day preference period where notice of a garnishment lien was served before the preference period, but a final judgment of garnishment occurred during the preference period. *Id.* The court held that a garnishment does not transfer money or other property until a final order of garnishment is issued—service of the notice of garnishment is not controlling. *Id.* at 412. The court opined that treating service of the notice of garnishment as a transfer would undermine the policy behind the preference-avoidance provision. *Id.* at 412.[2]

In support of its holding the court cited *Barnhill v. Johnson*, 503 U.S. 393, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992). In *Barnhill*, the Supreme Court held that a transfer made by check is deemed to occur on the date the check is honored, rather than the date the payee receives it for purposes of preference-avoidance. 503 U.S. at 400, 112 S.Ct. at

1390–91. The *Barnhill* court stated, "[m]yriad events can intervene between delivery and presentment of the check that would result in the check being dishonored." *Id.* at 399, 112 S.Ct. at 1390. The Seventh Circuit analogized the situation in *Barnhill* concerning the presentment of a check with the situation at bar concerning service of a writ of garnishment, acknowledging that a myriad of events could intervene "[b]etween the service of the notice of garnishment, corresponding to the delivery of a check, and the final order of attachment, corresponding to the bank's decision to honor the check...." *In re Freedom Group*, 50 F.3d at 412.

In the circuit court's view, *Barnhill* overruled cases holding that a transfer occurs at the moment notice of a garnishment lien is served. *Id.* The court identified several of these cases,[3] but noted that the cases had been decided before *Barnhill*. However, the court did recognize that at least one case had been decided since *Barnhill* that is in conflict with its views. *In re Battery One–Stop Ltd.*, 36 F.3d 493, 494–98 (6th Cir.1994).[4] The court distinguished *In re Battery One–Stop Ltd.*, pointing out that it failed to cite to *Barnhill*.

Under *In re Freedom Group*, service alone is insufficient to effect a preferential transfer. If its reasoning is applied to the present case, no preferential transfer would occur. This is so because TMHI filed for bankruptcy before a final judgment of garnishment was entered, but after the Bank was served. *In re Freedom Group* should not be followed.

The Court is of the opinion that *Barnhill* did not overrule cases holding that a transfer occurs when the notice of garnishment lien is

---

**2.** The court in *In re Freedom Group* wrote:

The purpose of allowing preferential transfers to be set aside is to prevent debtors who are tottering toward bankruptcy from playing favorites among their creditors, trying to keep alive a little longer by placating the most important ones. The reason for worrying about this favoritism is that the possibility of it makes creditors less likely to forbear—more likely to insist on immediate payment—and, if immediate payment is not forthcoming, to sue and obtain judgments, thus increasing the costs to all creditors, retarding an orderly liquidation, and hurrying the debtor into bankruptcy faster

than if creditors did not have to fear each other.
50 F.3d at 410–411 (cites omitted).

**3.** *In re Latham*, 823 F.2d at 108; *In re Conner*, 733 F.2d 1560, 1562 (11th Cir.1984); *Walutes v. Baltimore Rigging Co.*, 390 F.2d 350 (4th Cir. 1968); *In re Aztec Concrete, Inc.*, 143 B.R. 537, 540 (Bankr.S.D.Iowa 1992); *In re Arnold*, 132 B.R. 13 (Bankr.E.D.Mich.1991); *In re Brinker*, 12 B.R. 936 (Bankr.D.Minn.1981).

**4.** *One–Stop* holds that a transfer occurs at the moment service is effected.

served.[5] In *Barnhill*, the Supreme Court stated that receipt of a "check gives the recipient no right in the funds held by the bank on the drawer's account." *Barnhill*, 503 U.S. at 399, 112 S.Ct. at 1390. One reason for this noted by the Supreme Court is that after a payee receives a check "[a] third party could obtain a lien against the account by garnishment or other proceedings." *Id.* This obviously cannot happen in cases involving garnishment liens. Upon service of a writ of garnishment, the garnishor obtains an interest in the debtor's property. No creditor can obtain a judicial lien superior to that held by the garnishor after that time.

Furthermore, *In re Freedom Group* is overly broad. While it is true that a transfer of property occurs when a final order of garnishment is entered, it is equally true that a transfer occurs at the moment of service of process. The fact that in the former scenario the property transferred is tangible (right to funds in the debtor's bank account) and in the latter the property is intangible (lien on the debtor's bank account), is inconsequential.

 Therefore, the Court holds, as a matter of law, that a garnishor's interest is acquired under § 547(b) at the moment the writ of garnishment is served because the garnishor's status is converted from unsecured creditor to secured creditor. We may now define a transfer as more than a shift of assets, but also as a shift in positions, as between creditors, where intangible property is at stake. This holding comports with the broad definition given the terms "transfer" and "property." Also, it comports with the tendency courts have shown to construe preferential transfers broadly.

### 2. Effect of the Transfer

 The Court must now determine whether the transfer, which converted Aquila's interest from unsecured to secured, allowed Aquila to recover more than it would

have had the transfer not occurred. Generally, a determination of this nature is a question of fact, to be set side only when the findings are clearly erroneous. *See, e.g., Deel Rent–A–Car, Inc. v. Levine*, 16 B.R. 873, 874–75 (D.C.Fla.1982), *aff'd*, 721 F.2d 750 (11th Cir.1983). The standard of review changes, however, when a factual finding is premised on an improper legal standard, or when a proper legal standard is improperly applied. *In re Missionary Baptist Foundation of America, Inc.*, 712 F.2d 206, 209 (5th Cir.1983). In such cases, that finding looses the insulation of the clearly erroneous rule. *Id.*

As previously noted, the bankruptcy court found that no preferential transfer occurred. On this point, the court wrote:

> Aquila received no benefit from the garnished funds for the reason that [the Bank] set-off TMHI's account(s) against the unpaid balance of its loans after the writ was served but before the date of filing of the bankruptcy. It follows, therefore, that Aquila has not received "more than such creditor would receive if ... the case were a case under chapter 7 of this title...."

Also, the bankruptcy court found that there was no reason to determine the lien positions held by Aquila and the Bank at the time the writ of garnishment was served.

 The bankruptcy court's findings are premised on an improper legal standard. When a garnishor's status is changed from unsecured to secured, he would, by operation of law, be in a better position to recover a greater percentage of his claim. However, even if the results were that the garnishor would not recover a greater percentage of his claim, it is a sufficient status change that the garnishor receives an improved creditor status. *Deel Rent–A–Car*, 16 B.R. at 875; 11 U.S.C. § 549. Therefore, the bankruptcy court's conclusion looses the insulation of the

---

**5.** The *Barnhill* court wrote:
> We begin by noting that there can be no assertion that an unconditional transfer of the debtor's interest in property had occurred before [the 90 day preference period began]. This is because [ ] Myriad events can intervene be-

tween delivery and presentment of the check that would result in the check being dishonored. The drawer could choose to close the account. The bank might mistakenly refuse to honor the check.
503 U.S. at 399, 112 S.Ct. at 1390.

clearly erroneous standard and must be judged *de novo.*

■ Under *de novo* review, there is little doubt that Aquila's secured creditor status allows it to recover a greater percentage of its claim. Aquila was an unsecured creditor prior to service of the writ of garnishment. After service of the writ, Aquila was secured up to $1.8 million to the exclusion of other creditors. Trial testimony supporting this view shows that secured creditors will recover 100% of their claims while unsecured creditors will recover only 75% of their claims. Hence, the fifth element of § 547(b) is satisfied because Aquila would receive a greater percentage of its claim as a secured creditor. Accordingly, the Court holds that Aquila is the beneficiary of a preferential transfer pursuant to § 547(b).

### B. Benefit To The Estate

■ The Trustee is not necessarily entitled to avoidance because a preferential transfer occurred. Pursuant to § 550(a), preferences are avoidable only when the property that is the subject of the preference action is recovered for the benefit of the estate. The Court must determine whether the § 550(a)'s "benefit to the estate" requirement is applicable here. This determination requires an interpretation of §§ 550(a) and 547(b), and therefore, is reviewed *de novo.* *See In re Crouthamel Potato Chip Co.,* 786 F.2d 141, 144 (3rd Cir.1986).

#### 1. Benefit to The Estate Test

The Trustee contends that the bankruptcy court misinterpreted the "benefit to the estate" requirement of § 550(a). He argues that this section is an "affirmative recovery" provision that does not come into play until a preferential transfer has been avoided under § 547(b). In his view, Aquila's preferential transfer need not benefit the estate because no affirmative relief is sought.

The Trustee's contention is not without merit. At first glance, the language of § 547(b) and § 550(a) appear to support the Trustee's contention. Section 547(b) allows a trustee to avoid preferential transfers when the five elements are met, none of which includes § 550(a)'s benefit to the estate requirement. *See* 11 U.S.C. § 547(b). On the other hand, § 550(a) permits a trustee to recover the property or the value of such property avoided under § 547. *See* 11 U.S.C. § 550(a).

The Court concludes that the Trustee has met the § 547(b) requirement because, as stated earlier, the writ of garnishment effected a preferential transfer. However, further discussion is required to determine the merit of the Trustee's claim that he is not attempting to recover property or the value of such property, but merely an avoidance.

■ The Supreme Court has stated that in interpreting the Code courts should "look first to the statutory language and then to the legislative history if the statutory language is unclear." *Toibb v. Radloff,* 501 U.S. 157, 162, 111 S.Ct. 2197, 2200, 115 L.Ed.2d 145 (1991) (quoting *Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 1547–48, 79 L.Ed.2d 891 (1984)). This analysis should be used except in the rare case in which a literal application would lead to a result demonstrably at odds with the drafter's intentions. *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 1030–31, 103 L.Ed.2d 290 (1989). Hence, courts should depart from the strict language of a Bankruptcy Code section only when the language is unclear, ambiguous, or clearly contrary to the Code's purpose and history.

Here, the language of §§ 547(b) and 550(a) are at odds with bankruptcy law's longstanding principal to refuse to allow a debtor to avoid a lien where only the debtor, not the general creditors, benefit. *See, e.g., Whiteford Plastics Co. v. Chase Nat. Bank of New York City,* 179 F.2d 582 (2d Cir.1950) (refusing to allow debtor to avoid a defectively recorded lien because only the debtor would benefit, not the general creditors); *see also, e.g., City Nat'l Bank & Trust Co. v. Oliver,* 230 F.2d 686 (10th Cir.1956) (concurring with *Whiteford's* benefit to the estate analysis). Therefore, a look to the legislative history is necessary.

The legislative history indicates that the separation of avoidance and recovery principals was intentional. Enactment of the

Code's avoidance and recovery provisions represented a dramatic departure from its predecessor, the Bankruptcy Act of 1898 (the "Act"), Pub.L. No. 696, 30 Stat. 544 (repealed 1978). Under the Act, each avoidance section contained its own recovery scheme. *See, e.g.,* 11 U.S.C. §§ 67 *et seq.* (repealed). Under the Code, §§ 544, 545, 547, 548, and 549 govern avoidable transfers and § 550 governs whether, and to what extent, such transfers may be recovered.

In enacting the Code, Congress stated that "[s]ection 550 ... enunciates the separation between the concepts of avoiding a transfer and recovering from the transferee." H.R.Rep. No. 595, 95th Cong., 1st Sess. 375 (1977), reprinted in 1978 U.S.C.C.A.N. pp. 5787, 5963, 6331 ("H.R.Rep. No. 595"). This intent to separate becomes even more apparent when one considers that Congress provided for different statutes of limitations for avoidance. *See* 11 U.S.C. §§ 546(a) and 550(f).

▮ Notwithstanding, the Court finds the Trustee's contentions unpersuasive. Under the Act, garnishment liens could be avoided only if avoidance benefitted the estate.[6] In rewriting the avoidance and recovery provisions, Congress was unconcerned with this rule. Instead, Congress enacted the Code's avoidance and recovery provisions to clear up confusion concerning a trustee's right to recover property that was fraudulently transferred and sold to an innocent purchaser, and the procedural difficulties that flow from this scenario.[7] Under the Code, "the particular theory under which a transfer has been avoided is, for all intents and purposes, irrelevant to the liability of the transferee against

6. See, *e.g., Whiteford Plastics Co.,* 179 F.2d at 584; *City Nat'l Bank & Trust Co.,* 230 F.2d at 689–90.

7. *See* 4 Collier on Bankruptcy § 550.01 at 550–3 (15th ed. 1996) ("Collier 15th ed."); 4 Collier on Bankruptcy § 67.41[6] at 603 (14th ed.1978); and, the cases cited therein.

8. *See Collier,* 15th Ed. at 550–53 (stating that "[§ 550] combines parallel sections under prior law defining the rights and liabilities of transferees when the transfers under which they acquired property of the debtor have been avoided"); H.R.Rep. No. 595 at 375, U.S.Code Cong. & Admin.News 1978 at 6331 (stating that § 550

whom the trustee claims recovery of the property." *Collier 15th* at 550–3.

▮ In short, § 550 is a rights and liabilities provision, not an affirmative recovery provision.[8] Describing § 550 as an affirmative recovery provision misconstrues the purpose for which avoidance and recover principals were separated and implies that Congress intended a change in the law that it did not.

Moreover, the Trustee is, in fact, seeking to recover property in this case because he seeks to shift Aquila back to the position of unsecured creditor. The Court noted earlier that with regards to bankruptcy estates, property is defined by state law. Texas law defines property as including security interests. The Trustee's attempt to avoid Aquila's security interest is nothing more than an attempt to recover a property interest. The recovery of any property, or interest in property, must be for the benefit of the estate.[9]

▮ Accordingly, the Court holds that § 550(a)'s "benefit to the estate test" applies when a trustee attempts to avoid a security interest acquired by garnishment lien.

### 2. Does Avoidance Action Benefit Estate?

The Trustee contends that the avoidance action benefits TMHI's estate. He argues that the bankruptcy court overlooked valuable concessions made by the Bank while negotiating the confirmation plan. For example, the Trustee maintains that under § 506(b), the Bank, as a fully secured creditor, had the right to recoup any attorneys fees incurred in defending Aquila's state action for $1.8 million. Among the compro-

"prescribes the liability of a transferee of an avoided transfer ...").

9. By arguing that he is not seeking an affirmative recovery, i.e., that a security interest is not property, the Trustee is attempting to have his cake and eat it too. On the one hand, the Trustee argues that a security interest acquired by garnishment lien is property; therefore, a preferential transfer occurred. On the other hand, he argues that a security interest is not property; therefore, § 550(a)'s benefit to the estate requirement does not apply. These arguments are legally inconsistent.

mises made in the plan, is the Bank agreement that its attorneys fees would be treated as an unsecured claim and that the amount of its attorneys fees would be limited to $200,-000. Therefore, it is the Trustee's contention that the bankruptcy court erred in holding that no preference transfer had occurred because to avoid the writ would not benefit the estate.

■■■■■ The determination on whether a preference action benefits an estate, i.e., unsecured creditors, is made on a case-by-case basis. *In re Sweetwater*, 884 F.2d 1323, 1326–27 (10th Cir.1989). Hence, it is a factual determination to be set aside only if the findings are clearly erroneous. *In re Missionary Baptist Foundation of America*, 712 F.2d at 209. A factual finding is clearly erroneous, "when although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been committed." *Id. (citing United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).

It appears that the bankruptcy court concluded that the Bank, not the unsecured creditors, would benefit from the Trustee's preference action. This was a reasonable finding considering that Aquila's state court action against the Bank will in all likelihood be dismissed if the Trustee successfully avoids Aquila's preference. Moreover, it was the Bank's setoff, in the face of Aquila's writ of garnishment, that has lead to it possibly incurring cost in its defense.

Nevertheless, the Court is troubled by the bankruptcy court's implication that any possible benefit flowing from the liquidation plan is irrelevant. The bankruptcy court wrote:

... In the event of the trustee's failure to succeed in the avoidance action, [the Bank] will be able to amend its unsecured claim to increase it by as much as $200,000 for additional legal fees which it will ostensibly incur defending itself in state court.

... Through the machinations of the confirmed plan [ ] a loss of the suit at trial could ultimately result in as much as a $200,000 diminishment of the estate funds otherwise available to unsecured creditors. Any conceivable benefit to the estate derived from the prosecution of this suit flows from the compromise embodied in the [liquidation] plan rather than [Aquila's state court action].[10]

The bankruptcy court's finding goes against the policy of the law that encourages compromise between a trustee and creditors. *See, e.g., In re Jackson Brewing Company v. Herpel*, 624 F.2d 599, 604 (5th Cir.1980) (stating that "[t]he very uncertainties of outcome in litigation, as well as the avoidance of wasteful litigation and expense, lay behind the Congressional infusion of a power to compromise") (quoting *Florida Trailer and Equipment Co. v. Deal*, 284 F.2d 567, 571 (5th Cir.1960)).

■■■■ After the bankruptcy proceeding began, the Bank filed a claim with TMHI's estate seeking reasonable attorneys' fees under 11 U.S.C. § 506(b).[11] The Trustee could either deny the Bank's claim as one not qualifying under § 506 and risk losing this dispute on the merits or, he could negotiate with the Bank to limit any potential recovery of attorneys' fees. He chose the latter. If benefits worked out in a liquidation plan are deemed irrelevant, parties will be discouraged from entering into such agreements.

---

**10.** Although the bankruptcy court recognized that a benefit would flow to the estate based on the liquidation plan, it dismissed that benefit. Whether the Trustee earns the attorneys' fee or the Bank, the fee for setting aside the preference in state or bankruptcy court is real. The extent of recovery is the issue.

**11.** Section 506(b) provides:
To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this sec-

tion, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose. 11 U.S.C. § 506(b). Under this section, secured creditors are entitled to reasonable attorneys' fees if those fees are expressly provided for in the loan and security agreements. *In re Auto Specialties Mfg. Co.*, 18 F.3d 358, 360 (6th Cir.1994).

■ It is significant that the bankruptcy court confirmed the liquidation plan. In deciding whether to confirm a plan, a bankruptcy court must consider:

(1) The probability of success in the litigation, with due consideration for the uncertainty in fact and law,

(2) The complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and

(3) all other factors bearing on the wisdom of the compromise.

*In re Jackson Brewing Company*, 624 F.2d at 602.

In the case at bar, the bankruptcy court approved the liquidation plan, evidently concluding that these factors had been satisfied. The TMHI plan was legally binding on the Trustee and creditors from that point forward. Thus, it makes sense that the agreement should have some legal import on subsequent proceedings involving these parties.

■ To clarify, the Court is not suggesting that confirmation of a liquidation plan in a settlement hearing has a res judicata or collateral estoppel effect on preference actions, such as the dispute between Aquila and the Bank. This is unlikely because settlement hearings and preference actions involve the application of different legal standards.[12] However, it is one thing to say that confirmation of a liquidation plan effected during a settlement hearing does not bind a court on the issue of whether an estate benefits and yet another to say that, even if the court finds that an estate benefits under a confirmed plan, that benefit is of no consequence. In the Court's opinion, a finding that a benefit exists under a confirmed liquidation plan is sufficient to satisfy the "benefit to the estate" requirement.

Accordingly, the Court holds that a benefit to the estate meets § 550's requirements where the trial court finds that such a benefit flows from the confirmed liquidation plan.

In so holding, the Court does not disagree with the bankruptcy court's findings of fact, but simply makes a different application of the law to those facts.

### 3. Is Benefit to Estate Under the Plan Sufficient?

Giving credence to the confirmed liquidation plan, a question still exists as to whether the plan sufficiently benefits TMHI's estate. Because this Court finds that the bankruptcy court applied the wrong legal standard concerning the impact of a confirmed liquidation plan, *de novo* is the appropriate review standard.

■ Aquila contends, as the bankruptcy court suggested, that the plan's alleged benefit is insufficient. On this point, the bankruptcy court recognized that a successful preference action by Aquila would benefit the estate only up to $200,000, the sum that the Bank would be entitled to if successful against Aquila. Aquila points out that, even in the best light, this amount represents an increase in benefits to unsecured creditors of less than 1%.

The Court holds that the benefit provided by the plan is sufficient. There is no threshold percentage of recovery that must be reached before a preferential transfer is avoidable. *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 972 n. 13 (Bankr.D.Del. 1994).[13] Hence, § 550's benefit to the estate requirement is satisfied once there is an identifiable benefit. *See, e.g., id.* at 969–74. Therefore, the confirmed liquidation plan sufficiently benefits TMHI's estate.

### II. Aquila's Cross–Appeal

Aquila raises five issues on cross-appeal. First, Aquila argues that the bankruptcy court's finding that TMHI was insolvent on the date that the writ of garnishment was served is clearly erroneous. The first and foremost factual issue addressed at trial was

---

12. *In re Zale*, 62 F.3d 746, 766, n. 60 (5th Cir. 1995); *see also Copeland v. Merrill Lynch & Co.*, 47 F.3d 1415, 1423 (5th Cir.1995) (noting that the fair or equitable and in the best interest of the estate standard used in settlement hearings "is a different inquiry, driven by different policies, than litigation of the actual claim").

13. In *In re Trans World Airlines*, the court stated: "[t]here is nothing in the Code to support an argument that the size of the recovery relative to the size of the debtor should be considered in allowing preference actions". 163 B.R. at 972 n. 13.

whether TMHI was solvent on the date of the relevant transfer.

■ The bankruptcy court applied the "going-concern" approach in determining the fair value to be assigned to the business. It found questionable the testimony of Aquila's expert on value. Nevertheless, Aquila would have this Court hold that TMHI was solvent by nearly $3,000,000.[14] However, this sum is insignificant and is refuted by other expert testimony which the bankruptcy court chose to accept. Under such circumstances, this Court cannot say that the bankruptcy court's findings are clearly erroneous, and the Court declines to follow Aquila's argument.

■ Second, Aquila argues that the Trustee should have been estopped from presenting evidence that TMHI was insolvent because TMHI's chief finance officer testified in the garnishment proceedings that TMHI was solvent on the transfer date. In response, the Trustee argues that there is no basis to estop a post-petition trustee from contradicting testimony of a pre-petition debtor representative. The Court agrees because the testimony merely expressed an opinion of an officer of the corporation. The corporation is a person under the law and its solvency is determinable.

The doctrine of "judicial estoppel" is designed to prevent parties from taking contrary positions at different times on the same subject matter. *Continental Illinois Nat'l Bank & Trust Company of Chicago v. Morris Windham*, 668 F.Supp. 578, 581 (E.D.Tex.1987). The doctrine requires identical adversaries and identical subject matter. *Id.* Therefore, the Trustee, a distinct legal person from the debtor, is not bound by a debtor's representations. *Shopmen's Local Union No. 455 v. Kevin Steel Products, Inc.*, 519 F.2d 698, 704 (2d Cir.1975). Therefore, Aquila's second argument is without merit.

■ Third, Aquila argues that the bankruptcy court erred by not dissolving TMHI's liquidation plan, which prohibits Aquila from suing the Bank. To support its argument, Aquila relies on a recent Fifth Circuit Court

of Appeals opinion, *In re Zale*, 62 F.3d 746, 749–60 (5th Cir.1995). Aquila maintains that *In re Zale* stands for the proposition that the bankruptcy court lacks jurisdiction to enjoin the tort claims of a non-debtor, such as Aquila, against another non-debtor, such as the Bank, even though the injunction is a material part of the court approved settlement.

The Court disagrees in this instance. Aquila's reading of *In re Zale* misstates it's position. There, the settling parties attempted to permanently enjoin the tort claims of parties who were not otherwise subject to the bankruptcy court's authority. *In re Zale*, 62 F.3d at 749–51. Here, the stay entered is statutory and once a settlement is accomplished, it ends. But more importantly, Aquila's writ of garnishment proceeding, not it's cause of action against the Bank, is subject to the bankruptcy court's jurisdiction. *See In re Jensen*, 946 F.2d 369 (5th Cir.1991). Finally, Aquila has filed its proof of claim and therefore has subjected itself to the equitable jurisdiction of the bankruptcy court. Aquila cannot now complain about the bankruptcy court's rulings except under the appropriate appellate review.

■ *In re Zale* actually supports the bankruptcy court's jurisdiction where it states that a bankruptcy court may properly hold jurisdiction in any civil proceeding "related to" the Title 11 case. *Id.* at 751–52. A proceeding is "related to" the Title 11 case "if 'the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.'" *Ibid.* (quoting *In re Wood*, 825 F.2d [90,] 93 (5th Cir.1987) (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir.1984))). Further, "'[a]n action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and ... in any way impacts upon the handling and administration of the bankrupt estate.'" *Ibid.* (quoting *In re Walker*, 51 F.3d [562,] 569 [ (5th Cir.

14. The estimates proffered by Aquila shows assets of $93,421,972 and liabilities of $90,320,122, a difference of $3,000,000.

1995) ] (quoting *Pacor, Inc.,* 743 F.2d at 994)).

 Aquila's writ proceeding against the Bank is unquestionably related to the estate. Aquila is seeking to recover directly or indirectly funds that are the property of the bankrupt estate. Those funds were in the hands of the Bank at the time that the writ of garnishment was served. In addition, both Aquila and the Bank have filed proof of claims with TMHI's estate. The Bank has filed as a secured creditor of the estate and Aquila has filed as both a secured and an unsecured creditor. Furthermore, the Bank arguably has a claim for reimbursement against the estate pursuant to § 506. Consequently, permitting Aquila's state garnishment action against the Bank to proceed would impact TMHI's estate.

In addition, this issue was addressed by this Court and the Fifth Circuit Court of Appeals when Aquila appealed the confirmation of the liquidation plan. In both instances, the issue was declared moot. The Court discerns no reason legally or equitably, to reconsider these holdings. Therefore, the Court rejects Aquila's third argument.

Fourth, Aquila argues that the Trustee is not authorized to prosecute TMHI's liquidation plan in light of the bankruptcy court's finding that the estate did not benefit. This argument directly contradicts the bankruptcy court's conclusion that the Trustee "generally has standing to prosecute" avoidance causes of action. Aquila offers neither case law nor an argument as to why the bankruptcy court's conclusion is incorrect. Instead, it proceeds with a rambling argument of how a continuation of this appeal does nothing more than delay unsecured creditors from realizing their claim. This argument is unpersuasive. In any event, the point is moot in light of the Court's holding that the Trustee's preference action does, in fact, benefit the estate.

 Finally, Aquila argues that the bankruptcy court erred in denying it a jury trial on the preferential transfer proceedings. Creditors who submit claims to the bankruptcy court, as Aquila has, have no Seventh Amendment right to a jury trial when sued by the trustee to recover a preferential transfer. *See Langenkamp v. Culp,* 498 U.S.

42, 111 S.Ct. 330, 112 L.Ed.2d 343 (1991). Thus, this argument also fails.[15]

## CONCLUSION

For these reasons, the Trustee prevails on his appeal and Aquila fails on its cross-appeal. Further, Aquila's request for oral arguments is denied. The Court, therefore, reverses in part, the bankruptcy court's judgment and renders judgment for the Trustee.

---

**15.** Whether Aquila may or may not go forward on its civil action against the Bank is not determined or suggested here. However, the garnishment proceeding is moot.