John W. **WEAVER**, Liquidating Trustee, Plaintiff,

v.

Richard C. **KELLOGG**, Frans G.J. Speets and TMH (Trans Marketing Houston), N.V., Defendants.

Civ. A. No. H–94–3703.

United States District Court, S.D. Texas, Houston Division.

Jan. 8, 1997.

---

Diana Merrill Woodman, Boris A. Hidalgo, James R. Leahy, Daniel H. Johnston, Jr., Brown Parker & Leahy, Houston, TX, for Plaintiff.

Charles G. King, III, King and Pennington, Houston, TX, for Defendants.

MEMORANDUM AND ORDER

ATLAS, District Judge.

## TABLE OF CONTENTS

INTRODUCTION ...................................................... 568
I. FACTUAL BACKGROUND ............................................ 569

| | | | | |
|---|---|---|---|---|
| II. | SUMMARY JUDGMENT STANDARD | | | 570 |
| III. | PLAINTIFF'S CLAIMS AND DEFENDANTS' MOTION FOR SUMMARY JUDGMENT | | | 570 |
| | A. | Promissory Notes to TMHI | | 571 |
| | | 1. | The Note Transactions | 571 |
| | | | a. Pioneer Loan Notes | 571 |
| | | | b. Accounts Receivable Notes | 571 |
| | | | c. TMH N.V. Loan Note | 571 |
| | | 2. | Plaintiff's Claims for Avoiding the Note Transactions | 572 |
| | | | a. 11 U.S.C. § 548(a)(2) and Texas Business and Commerce Code § 24.005(a)(2) and 24.006(a) | 572 |
| | | | (i) Transfer | 573 |
| | | | (ii) Less Than Reasonably Equivalent Value | 574 |
| | | | (iii) Other Requirements | 575 |
| | | | (a) Insolvency | 575 |
| | | | (b) Unreasonably Small Capital | 576 |
| | | | (c) Intent to Incur Debts Beyond Its Ability to Pay | 576 |
| | | | b. 11 U.S.C. § 548(a)(1) and Texas Business and Commerce Code § 24.005(a)(1) | 576 |
| | B. | Payments of Salary and Expenses to Speets and Kellogg | | 577 |
| | C. | Breach of Corporate Duties | | 579 |
| | | 1. | Plaintiff's Allegations | 579 |
| | | | a. Pioneer Acquisition | 579 |
| | | | b. Foreign Distribution Companies | 580 |
| | | | c. Personal Cash Advances to Speets and Kellogg | 580 |
| | | | d. December 1992 Promissory Note Transactions | 580 |
| | | 2. | Speets and Kellogg's Defenses | 580 |
| | | | a. Sole Shareholders and Sole Directors Argument | 581 |
| | | | b. Business Judgment Rule | 584 |
| | D. | Alter Ego Doctrine | | 584 |
| | E. | Conspiracy | | 586 |
| | F. | Punitive Damages | | 586 |
| | G. | Statute of Limitations | | 586 |
| IV. | PLAINTIFF'S CROSS–MOTION FOR PARTIAL SUMMARY JUDGMENT | | | 587 |
| V. | MOTIONS TO STRIKE | | | 587 |
| | A. | Defendants' Motion to Strike Affidavits of Weaver, Deweese, and Chernow | | 587 |
| | | 1. | Weaver | 587 |
| | | 2. | Deweese | 587 |
| | | 3. | Chernow | 588 |
| | B. | Plaintiff's Motion to Strike Supplemental Affidavits of Defendants | | 588 |
| VI. | CONCLUSION | | | 588 |

### INTRODUCTION

Plaintiff John W. Weaver ("Plaintiff") is the Liquidating Trustee for Trans Marketing Houston International ("TMHI"), a petroleum and chemical trading corporation that filed for Chapter 11 bankruptcy in April 1993. In this action, Plaintiff, on behalf of TMHI's creditors, is seeking to recover TMHI's unpaid debts from TMHI's founders and sole shareholders, Defendants Richard C. Kellogg ("Kellogg") and Frans G.J. Speets ("Speets"), and from another corporation established by Speets and Kellogg, Defendant Trans Marketing Houston, N.V. ("TMH N.V.").

In a 34–count complaint, Plaintiff has alleged a variety of legal theories to support this recovery. See Amended Complaint, Exhibit A to Exhibit 1 of Appendix to Defendants' Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment [Doc. # 37] ("Complaint").[1] Stated briefly, Plaintiff contends that Defendants Speets and Kellogg breached their corporate duties as directors of TMHI; wrongfully diverted substantial sums of money from TMHI for their own personal benefit, despite TMHI's financial instability; and so should be held personally liable to TMHI's creditors in the

**1.** Although the Complaint lists 35 charges, Count 31 is a duplicate of Count 30.

wake of its bankruptcy. Speets and Kellogg vigorously deny that they violated any law or corporate duty and thus deny that they should be held personally liable for any of TMHI's debts. Contrary to Plaintiff's assertions, Defendants insist that TMHI was financially healthy up until the brink of its bankruptcy and, therefore, as sole shareholders in the corporation, they were free to use its assets however they wished.

Pending before the Court are **Defendants' Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment** ("Motion") [Doc. # 36] and **Plaintiff's Cross–Motion for Partial Summary Judgment** ("Cross–Motion") [Doc. # 65]. Both sides have also filed motions to strike portions of each other's testimony. *See* **Defendants' Motion to Strike Affidavits of Weaver, Deweese, and Chernow** ("Defendants' Motion to Strike") [Doc. # 61] and **Plaintiff's Motion to Strike and Objection to Supplemental Affidavits of Defendants** ("Plaintiff's Motion to Strike") [Doc. # 81].

After considering the Motions and their supporting exhibits, the responses and replies, all other matters of record in this case, and the relevant authorities, the Court concludes, in sum, that all of the determinative issues in this case are fact-based inquiries requiring a trial. For this and other reasons stated below, Defendants' Motion for Summary Judgment [Doc. # 36] is now **DENIED,** and Plaintiff's Cross–Motion for Partial Summary Judgment [Doc. # 65] is **DENIED.** In addition, both Defendants' and Plaintiff's Motions to Strike [Docs. # 61 and # 81] are **DENIED.**

## I. *FACTUAL BACKGROUND*

In 1985, Defendants Speets and Kellogg established TMHI, a petroleum and chemical trading corporation, for which they were the sole shareholders. Originally incorporated in Texas, TMHI was reincorporated in Delaware on December 31, 1991. From the time of TMHI's original incorporation until May 1992, Speets and Kellogg were also the company's sole directors. TMHI grew from a start-up business in 1985 to a company that grossed $1.3 billion in 1990. However, in April 1993, TMHI filed for Chapter 11 bankruptcy. *See* Bankruptcy No. 93–43008–H4–11. Plaintiff Weaver was appointed trustee and, in October 1994, brought the current action on behalf of TMHI and its creditors.

According to Defendants, TMHI became insolvent when one of its principal lenders, Banque Paribas, unexpectedly and suddenly withdrew its support in April 1993. According to Plaintiff, however, TMHI was an undercapitalized company that was in fact insolvent for a number of years before it filed for bankruptcy.

Apparently, Speets and Kellogg used money from TMHI to finance a number of other chemical trading operations, either through direct start-up loans from TMHI or through loans channeled first through Defendant TMH N.V., a Netherlands Antilles corporation, also owned and run by Speets and Kellogg. These transactions included the establishment of thirteen affiliated foreign distribution companies in Latin America and Europe, owned primarily by TMH N.V., and Speets and Kellogg's personal acquisition of Pioneer Chlor Alkali, Inc. ("Pioneer"), a company specializing in the production and trade of caustic soda.

Plaintiff alleges that Speets and Kellogg structured these transactions in ways that were unfair to TMHI and beneficial to the other operations and to Speets and Kellogg personally. In addition to the money Speets and Kellogg withdrew from TMHI to start these other companies, Plaintiff alleges that Speets and Kellogg advanced large sums from TMHI for their own personal expenses. According to Plaintiff, these withdrawals from a thinly capitalized corporation eventually led to TMHI's insolvency. When TMHI filed for bankruptcy, it left behind more than $22 million in unpaid debt. Meanwhile, Plaintiff claims, Speets and Kellogg each personally profited from its transactions involving TMHI by at least $25 million, while other operations they established with TMHI's capital continue to thrive.

Plaintiff argues, for reasons described below, that TMHI's creditors should not be left unpaid in the wake of TMHI's bankruptcy after Speets and Kellogg intentionally diverted TMHI's assets to themselves and other

corporations which Speets and Kellogg continue to control. In their defense, Speets and Kellogg adamantly argue that they did nothing wrong, that they violated no law or corporate duty, that as sole shareholders of TMHI their only duty of loyalty was to themselves, that their transactions were lawful because TMHI was solvent until just before it filed for bankruptcy, and that some of Plaintiff's charges are barred by the statute of limitations.

Plaintiff asserts 34 claims seeking to hold Defendants liable for TMHI's debts to its creditors, or at least to disgorge unfair profits and transfers of cash that Defendants made from TMHI. In their Motion for Summary Judgment, Defendants contest every charge. In his Cross–Motion for Partial Summary Judgment, Plaintiff attempts to focus the issues by urging the Court to accept Plaintiff's assertions (1) that TMHI was legally insolvent during the relevant time periods and (2) that, even as sole shareholders, Speets and Kellogg owed a duty of loyalty to TMHI and its creditors.

## II. *SUMMARY JUDGMENT STANDARD*

In deciding a motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (en banc); *Bozé v. Branstetter*, 912 F.2d 801, 804 (5th Cir.1990). The facts are to be reviewed with all inferences drawn in favor of the party opposing the motion. *Bozé*, 912 F.2d at 804 (citing *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir.1986)). However, factual controversies are resolved in favor of the nonmovant "only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir.), *revised on other grounds upon denial of reh'g*, 70 F.3d 26 (5th Cir.1995).

The party moving for summary judgment has the initial burden of demonstrating the absence of a material fact issue with respect to those issues on which the movant bears the burden of proof at trial. For any matter on which the nonmovant carries the burden of proof at trial, however, the movant may, by merely pointing to the absence of evidence supporting the essential elements of the nonmovant's case, shift to the nonmovant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact so as to warrant a trial. *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718–19 (5th Cir.1995); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994). The nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence. *Douglass v. United Services Auto. Ass'n*, 65 F.3d 452, 459 (5th Cir.1995), *revised on other grounds*, 79 F.3d 1415 (5th Cir.1996) (en banc); *Little*, 37 F.3d at 1075. In the absence of any proof, the Court will not assume that the nonmovant could or would prove the necessary facts. *McCallum Highlands*, 66 F.3d at 92; *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 3188–89, 111 L.Ed.2d 695 (1990)). Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial. *Little*, 37 F.3d at 1075 (citing *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552–53).

## III. *PLAINTIFF'S CLAIMS AND DEFENDANTS' MOTION FOR SUMMARY JUDGMENT*

Defendants' Motion organizes Plaintiff's 34 counts into five categories: promissory notes to TMHI; payments of salaries and expenses to Speets and Kellogg; breach of corporate duties; alter ego doctrine; and punitive damages. The Court adopts this organizational

approach. Defendants argue in addition, as an affirmative defense, that the statute of limitations bars some of Plaintiff's claims.

### A. *Promissory Notes to TMHI*

Plaintiff claims that five promissory notes to TMHI executed by Defendants reflect avoidable transactions under the federal bankruptcy and Texas commercial statutes [2] because these transactions served to put a substantial amount of TMHI's capital beyond its reach at a time when the company was in a precarious financial condition.

#### 1. The Note Transactions

The notes, all executed on December 10, 1992, include the following:

#### a. Pioneer Loan Notes

Two notes, each for $2,212,055.10, one executed by Speets, one executed by Kellogg, reflect the $3,000,000, plus accrued interest, which Speets and Kellogg borrowed from TMHI in order for Defendants personally to purchase Pioneer. These notes replaced two earlier notes, one for $1,000,000 and one for $2,000,000, which Speets and Kellogg had executed jointly on October 20, 1988.[3] Under the terms of the original notes, principal was to be repaid after 10 years, on October 20, 1998, but interest was payable annually. Originally, the $1,000,000 note had an interest rate of 9%, and the $2,000,000 note had a variable interest rate. The replacement notes, however, both carried an interest rate of 7%, and *no interest or* principal payments were due until October 20, 1998. *See* Complaint, at 2–3; Exhibits B, C, D, and E to Exhibit 1 of Appendix to Defendants' Motion for Summary Judgment [Doc. # 37]. At the time the replacement notes were executed,

Defendants were in default on four years of interest payments.[4]

#### b. Accounts Receivable Notes

One note for $1,113,347.25, executed by Speets, and one note for $692,157.05, executed by Kellogg, reflect Speets and Kellogg's personal expenses accounts receivable balances with TMHI. Each new note was due on December 31, 1998. These notes replaced two earlier notes, each dated December 31, 1991, that were due in two equal installments on December 31, 1992, and December 31, 1993. Again, the replacement notes had higher face values because they included unpaid accrued interest. The original notes had interest rates of 7%, but the replacement notes carried interest rates of 6%, and no interest payments were due before December 31, 1998. *See* Complaint, at 2–3; Exhibits L, M, N, and O to Appendix to Trustee's Amended Response [Doc. # 55].

#### c. TMH N.V. Loan Note

One note for $2,239,211.17 was executed by TMH N.V. Due on December 31, 1998, this note, carrying an interest rate of 6%, replaced several loans extended to TMH N.V. *See* Complaint, at 4; Exhibit H to Exhibit 1 of Appendix to Defendants' Motion for Summary Judgment [Doc. # 37]. The parties dispute the terms of the original loans, which Defendants claim were not put into writing. Plaintiff argues that these loans were immediately due and payable as an open account receivable and that TMH N.V. would have owed a default rate of 10%. Defendants, on the other hand, argue that before this replacement note was executed, TMH N.V. did not have a duty to pay any interest on these loans. The Court notes that under Tex.Rev. Civ.Stat.Ann. art. 5069–1.03, "[w]hen no spec-

---

**2.** At the time the notes were executed, December 1992, TMHI was incorporated in the state of Delaware. Although the parties dispute whether Texas law or Delaware law applies to Plaintiff's breach of corporate duties claims (*see infra* Section III.C.), neither party discusses whether Texas law necessarily applies to Plaintiff's fraudulent transfer claims.

**3.** Plaintiff's original Complaint alleges that the original notes which were replaced by these notes were each in the amount of $1,500,000. *See* Complaint, at 3. Plaintiff later revised this assertion to reflect that one note was in the amount of $1,000,000 and one was in the

amount of $2,000,000. *See* Second Amended Complaint, Exhibit 1 to Motion for Leave to Amend Complaint [Doc. # 48], at 3. By order of September 25, 1996, the Court denied as untimely Plaintiff's Motion to amend his complaint, except for this factual clarification. *See* Order [Doc. # 78], at 3 n. 2.

**4.** Upon any default under the original notes, TMHI was entitled to make demand for the entire sum outstanding on the notes. Since Defendants controlled TMHI, the default, demand, or acceleration provisions were not invoked.

ified rate of interest is agreed upon by the parties," the default interest rate is 6%.

### 2. Plaintiff's Claims for Avoiding the Note Transactions

Defendants Speets and Kellogg in their Motion argue that all of these notes merely replaced existing legitimate obligations and do not represent avoidable transactions. Defendants claim that it was not their idea to execute the new notes, but instead they executed them at the insistence of Banque Paribas, a principal TMHI lender. Plaintiff, on the other hand, argues that these notes represent avoidable transactions through which Defendants reduced or extinguished valuable legal rights TMHI held against Defendants on the existing loans at a time when TMHI was insolvent and thus needed access to the monies loaned to Defendants under the defaulted notes in order to meet the company's obligations to its creditors. Plaintiff claims

that these promissory note transactions are avoidable under 11 U.S.C. § 548(a)(1) and (2) [5,6] and their state statutory counterparts, Texas Business and Commerce Code § 24.005(a)(1) and (2) [7] and 24.006(a).[8] Plaintiff contends that because these provisions apply, the extension of the payment dates and other terms of the promissory notes should be avoided, the notes should be declared immediately due and payable, and Defendants should be adjudged liable in the full amount of the notes, together with interest and costs.

### a. 11 U.S.C. § 548(a)(2) and Texas Business and Commerce Code § 24.005(a)(2) and 24.006(a)

In Counts 1, 5, and 9 of the Complaint, Plaintiff alleges that the promissory note transactions listed above are avoidable under 11 U.S.C. § 548(a)(2). *See* Complaint, at 7–9 [9]; *supra* note 6. In Counts 3, 7, and 11,

---

5. In his Complaint, Plaintiff repeatedly refers to § 548(b)(2) instead of § 548(a)(2). The Court assumes, however, that Plaintiff intended to refer to § 548(a)(2) because the Complaint paraphrases § 548(a)(2); there is no § 548(b)(2); § 548(b) refers to partnerships, which this case does not involve; Defendants briefed arguments regarding § 548(a)(2); and Plaintiff's later pleadings do not dispute this aspect of Defendants' characterization of the Complaint.

6. Under 11 U.S.C. § 548(a),

The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or
(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
　(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
　　(ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or
　　(iii) intended to incur, or believed that the debtor would incur, debts that would

be beyond the debtor's ability to pay as such debts matured.

7. Under Texas Business and Commerce Code § 24.005(a),

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose within a reasonable time before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
　(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
　(B) intended to incur, or believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

8. Under Texas Business and Commerce Code § 24.006(a),

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

9. Plaintiff's Complaint groups the promissory note transactions into three categories: (1) the

Plaintiff alleges that they are also avoidable under Texas Business and Commerce Code § 24.005(a)(2) or 24.006(a). *See* Complaint, at 7, 9–10; *supra* notes 7 and 8.

In order to prevail under these federal or state provisions, Plaintiff must prove the following elements for each transaction: (a) that the transaction constituted a *transfer*; (b) that TMHI received *less than reasonably equivalent value* in exchange for the transfer; and (c) one of the following: (i) that TMHI was *insolvent* at the time of the transfer or as a result of the transfer; (ii) that TMHI was left with *unreasonably small capital* after the transfer; or (iii) that at the time of the transfer TMHI *intended to incur debts beyond its ability to pay*.

### (i) Transfer

 Defendants argue that none of the 1992 promissory note transactions constitute transfers because TMHI did not give out any money in exchange for the notes. Instead, Defendants argue, all of the notes merely put pre-existing obligations into another form.

Plaintiff responds that the 1992 notes were in fact transfers from TMHI to Defendants because they extinguished or conveyed valuable legal rights TMHI held against Defendants. Specifically, Plaintiff claims the notes lowered the interest rates, extended the payment deadlines, severed Defendants' joint and several liability on the loans, extinguished TMHI's right to collect annual interest payments, and thus extinguished TMHI's then existing right to declare default and to demand accelerated repayment due to Defendants' nonpayment of accrued and payable interest.[10]

In response, Defendants claim merely that the notes were not transfers because, at least

with respect to the Pioneer loan notes, the payment due dates did not change after the new notes were executed. In addition, Defendants seem to argue that the TMH N.V. note cannot be considered a transfer because before the then accrued interest was reflected in the TMH N.V. note, and, at the time of execution of the new TMH N.V. note, TMHI did not have any legally enforceable right to interest payments on that loan.

For the purposes of Section 548, the Fifth Circuit has construed the term "transfer" very broadly. In *Matter of Besing*, 981 F.2d 1488, 1492 (5th Cir.1993), *cert. denied*, 510 U.S. 821, 114 S.Ct. 79, 126 L.Ed.2d 47 (1993), the court noted that " '[t]he word is used in its most comprehensive sense, and is intended to include every means and manner by which property can pass from the ownership and possession of another.' ... Indeed, the Code's expansive definition literally encompasses 'every mode ... of ... parting with ... an interest in property.' " *Id.* (quoting *Pirie v. Chicago Title & Trust Co.*, 182 U.S. 438, 21 S.Ct. 906, 45 L.Ed. 1171 (1901)); 11 U.S.C. § 101(54).

The Court agrees with Plaintiff that, as a matter of law, the execution of the new notes constituted transfers because they conveyed property to Defendants and altered TMHI's rights against Defendants. *See Matter of Besing*, 981 F.2d at 1492 (extinguishment of a legal claim constitutes a transfer). Although it is true that the principal repayment deadlines stayed the same for the Pioneer loan replacement notes, the revised accounts receivable notes substantially extended the maturity dates on those loans from 1992 and 1993 to 1998. In addition, the Pioneer loan replacement notes severed Defendants' joint and several liability on the loans.[11] Also, the

two notes executed by Speets; (2) the two notes executed by Kellogg; and (3) the note representing the loan to TMH N.V. Counts 1–12 are all grouped this way so that, for example, Count 1 refers to Speets' notes, Count 5 refers to Kellogg's notes, and Count 9 refers to TMH N.V.'s note. In the descriptions in the text above, they are referred to instead by type of transaction because the parties adopted these groupings in their later pleadings.

**10.** Plaintiff alleges that Defendants did not make any interest payments at all. Thus, it appears that, under the terms of the original notes, TMHI

could have demanded immediate repayment of the loans.

**11.** As described earlier, the original Pioneer loan notes, one for $1,000,000 and one for $2,000,000, were both executed by both Speets and Kellogg. However, the replacement Pioneer loan notes were executed by Speets and by Kellogg individually, and each of the notes incorrectly states that it replaces an earlier $1,500,000 note executed by the maker. Thus the replacement notes not only state incorrect face amounts for the original notes but also incorrectly indicate that Speets and Kellogg were individually

Pioneer loan and accounts receivable replacement notes carried lower interest rates, extinguished TMHI's right to collect annual interest payments, and thus extinguished TMHI's right to declare default and to accelerate the maturity of the notes and, thus, to obtain early repayment based on Defendants' apparent failure to pay currently due interest. The Court rejects Defendants' argument that TMHI had no right to collect interest on the TMH N.V. loan until the promissory note was executed. In the absence of any specific previous agreement between TMHI and TMH N.V., TMHI would have had the right to collect the statutory 6% interest rate on this loan. *See* Tex.Rev.Civ. Stat. Ann. art. 5069–1.03. Although the replacement note did not alter this interest rate imposed as a matter of law, the Court cannot at this time determine as a matter of law that the TMH N.V. loan did not constitute a transfer in the absence of evidence regarding other terms of the original loans.

### (ii) Less Than Reasonably Equivalent Value

■ Defendants argue that even if the promissory note transactions are considered to have been transfers, they are still not avoidable because TMHI received reasonably equivalent value in exchange for the transfers. Specifically, Defendants contend that at the time they executed the notes, they pledged additional collateral to secure the loans. Plaintiff argues that TMHI did not receive reasonably equivalent value in exchange for its relinquishment of its rights to a higher interest rate, accelerated repayment for Defendants' failure to pay interest, and Defendants' joint and several liability. Although Defendants may have purported to guarantee their loans with additional collater-

al at the time the notes were executed, Plaintiff argues that Defendants "were *already liable,* however, for more than this amount of money to TMHI and all of their assets—not just the portion ultimately pledged—were exposed for that liability." Trustee's Amended Response [Doc. # 54], at 18.

■ Defendants are correct that they do not need to prove a dollar-for-dollar exchange in order to show that TMHI received "reasonably equivalent value" in the transfers. *See Matter of Fairchild Aircraft Corp.,* 6 F.3d 1119, 1125–26 (5th Cir.1993). It is also true that a pledge of some or additional collateral may constitute value. *See id.,* at 1127 (in deciding whether a debtor received reasonably equivalent value so as to preclude post-bankruptcy avoidance of the transfer under 11 U.S.C. § 548, a court may consider "the increased monetary 'float' resulting from guarantying the loans of another").

However, the Court agrees with Plaintiff that the issue of whether TMHI received reasonably equivalent value in exchange for the alleged transfers is, in this case, a question of fact not suitable for determination in this case on a motion for summary judgment.[12] First, it is difficult to place monetary values on the assets TMHI allegedly gained and lost after Defendants' execution of the new promissory notes.[13] In addition, Plaintiff has alleged that Defendants had already exposed themselves to total personal liability even prior to their execution of the new notes. If Plaintiff's assertion is true, then Defendants' pledge of additional collateral in exchange for the more favorable terms on the new notes may not in fact have provided TMHI with additional value.

liable on the original notes, when they were in fact jointly and severally liable.

12. In *Matter of Besing,* 981 F.2d at 1494–95, the Fifth Circuit declined to determine whether reasonable equivalency is a question of law or of fact but noted that "the inquiry is ordinarily fact-intensive." The Court of Appeals cited other Fifth Circuit cases that seemed to treat reasonable equivalency as if it were a fact issue and noted that, of four other circuits that have directly addressed the issue, only one has treated it as a question of law. *See id.,* at 1494–95 n. 12.

13. In determining reasonably equivalent value, the Fifth Circuit has rejected use of a mechanical mathematical analysis, *see Matter of Fairchild Aircraft Corp.,* 6 F.3d at 1126 n. 7 (criticizing courts for construing *Durrett v. Washington Nat'l Ins. Co.,* 621 F.2d 201 (5th Cir.1980), to have established a strict 70% of fair market value test), and has instead embraced a "totality of the circumstances" standard, *see Matter of Besing,* 981 F.2d at 1495 n. 14. Under this broader standard, the factual determination is more complex and, in this case, clearly requires the factfinder to assess the contrary opinions of the competing experts.

### (iii) Other Requirements

### (a) Insolvency

The parties strenuously dispute whether TMHI was solvent at various points in time. While Defendants maintain that TMHI was solvent until just before the time it filed for bankruptcy on April 11, 1993, Plaintiff alleges that TMHI actually was insolvent long before that date. Plaintiff has offered testimony from several experts supporting his claim that TMHI was insolvent or "in the vicinity of" insolvency for years before filing for bankruptcy [14] and was clearly insolvent in December 1992, when the revised promissory notes were executed.

The parties argue extensively about the accounting methods offered by one another's expert witnesses and about the qualifications of those witnesses. In fact, Defendants have moved to strike the affidavits of three of Plaintiff's primary witnesses who testify on the issue of solvency. For reasons discussed *infra* in Section V.A., Defendants' Motion to Strike is denied. Therefore, the Court has considered the testimony offered by Plaintiff's witnesses.

Plaintiff contends that, at least at the time of the promissory note transactions, TMHI was clearly insolvent in the "balance sheet sense," in that its liabilities exceeded its assets *and* TMHI was unable to pay its debts as they came due in the ordinary course of its business. Defendants counter that Plaintiff's experts failed to use the fair market value test in measuring TMHI's assets and failed to include among TMHI's assets intangibles associated with TMHI being a "going concern." [15] In addition, Defendants argue that TMHI *was* able to pay its debts as they came due. Although Plaintiff offers evidence indicating that TMHI had to arrange repayment schedules with several suppliers because it was not able to meet its obligations to them, Defendants claim that there was nothing out of the ordinary for a major trading company to extend payments to some suppliers into installments, while paying accruing interest on unpaid balances.[16]

Plaintiff claims most significantly that the transactions reflected by the revised promissory notes were themselves responsible for TMHI's insolvency, or at least that those revised notes placed the Defendants' debts to TMHI beyond the company's reach during the time it needed the money (*i.e.*, in late 1992 and in 1993), and thus materially contributed to its insolvency. Plaintiff argues that because these debts were due so far in the future and because Defendants never made any interest payments on them, despite their promises to do so, it can be inferred that Defendants never intended to repay the loans, and that therefore the promissory notes should not be counted toward TMHI's assets. Defendants respond that it is absurd to allege that a company with gross proceeds exceeding $1 billion a year would have been forced into bankruptcy because of loans it made for $3 million five years before it filed for bankruptcy.[17]

---

**14.** The issue of TMHI's solvency during earlier periods is central to Plaintiff's breach of corporate duties claims, discussed *infra* in Section III.C. Plaintiff argues that for the breach of corporate duties claims, he does not have to prove actual insolvency, but instead has only a lighter burden of showing that TMHI was "in the vicinity" of insolvency.

**15.** While Plaintiff's experts Weaver and Deweese deny that TMHI was a "going concern" and thus claim that they should not include intangible values in their analyses, Plaintiff's third expert, Joseph Chernow, expresses opinions as to the value of TMHI's assets with TMHI considered a "going concern."

**16.** Plaintiff argues that in 1989, TMHI was unable to make lump sum payments for more than $8 million it owed and was forced to negotiate extended payment plans with several trade creditors. Defendants attempt to minimize this figure by pointing out that this amount represents only 1% of TMHI's $1.3 billion cash flow for that year.

**17.** It appears undisputed that the specific event triggering TMHI's declaration of bankruptcy was when, in April 1993, one of TMHI's unsecured creditors, Aquila Energy Marketing Corporation, obtained a writ of garnishment against TMHI's Banque Paribas account. At this point, Banque Paribas withdrew its support for TMHI and applied TMHI's deposit account balance to payment of TMHI's Banque Paribas loans. In *John W. Weaver v. Aquila Energy Marketing Corporation*, 196 B.R. 945 (S.D.Tex.1996), Judge Hoyt ruled that Trustee Weaver could avoid Aquila's attempt to obtain a "preferential transfer" (ahead of the interests of secured creditors) through its writ of garnishment.

The Court is unpersuaded by Defendants' argument. Plaintiff argues and has presented evidence indicating that TMHI had, at various times, financial difficulties due to shortages of working capital. It thus appears that TMHI's substantial gross trading revenues were largely offset by TMHI's substantial debts to suppliers and that the company generally operated on a relatively close profit margin.

The Court declines both Defendants' and Plaintiff's request to decide as a matter of law whether TMHI was solvent at the time of the promissory note transactions or at any other time. This question is clearly one of fact, and Plaintiff's submissions contain adequate evidence to preclude summary judgment on this issue.

■ Although the ultimate issue of solvency will not be resolved by the Court, the Court concludes that the insolvency evaluation through the balance sheet analysis should include consideration of TMHI as a "going concern" and asset values associated with such a classification. The amount, if any, of such values is for the factfinder to decide. The Bankruptcy Court's determination that TMHI was a "going concern" as of April 11, 1993, the date the bankruptcy petition was filed,[18] will be admissible at trial if any party chooses to introduce the opinion in evidence.[19]

■ In addition, the Court notes that because Defendants do not dispute that TMHI was insolvent in April 1993, Plaintiff may be able to prove insolvency at earlier periods through the process of "retrojection," *i.e.* "showing that the debtor was insolvent a reasonable time ... after the transfer and that the debtor's financial condition did not materially change during the intervening period." David G. Epstein, et al., Bankruptcy, § 6–49 (1992).[20]

### (b) Unreasonably Small Capital

Plaintiff alleges that, even if TMHI was not actually insolvent at the time, the promissory notes are still avoidable under the statutes because they were executed when TMHI was engaged or about to engage in a business or transaction for which the property remaining was an unreasonably small capital. In contrast, Defendants argue in their Motion that TMHI did have sufficient capital and stress that, as a trading company, TMHI did not need to maintain very much capital. Again, the Court concludes that this subject raises a fact question not appropriate for resolution on a motion for summary judgment.

### (c) Intent to Incur Debts Beyond Its Ability to Pay

Finally, Defendants simply deny that the revised notes could be voidable on the ground that they were executed at a time in which TMHI was intentionally incurring debts it knew it would not be able to pay. The issue of intent raises a classic question of fact, and the Court declines to resolve this issue as a matter of law under the factually complex circumstances established by the existing record.

### b. 11 U.S.C. § 548(a)(1) and Texas Business and Commerce Code § 24.005(a)(1)

■ In the alternative to the statutory provisions discussed *supra* in Section III. A.2.a., Plaintiff alleges in Counts 2, 6, and 10

---

**18.** See *TMHI, Inc. v. Aquila Energy Marketing Corp.*, Adv. No. 93–4269, 2 (Bankr.S.D.Tex. Aug. 22, 1995), Exhibit 1 to Trustee's Response to Defendants' Reply [Doc. # 64].

**19.** Although Defendants' current adversary, Trustee Weaver, litigated the solvency issue in the bankruptcy action, Defendants were not his opponents. Indeed, they apparently were aligned with the Trustee on this issue at the time of the prior litigation. The Court therefore deems the record inadequate to resolve the issue of whether Defendants are collaterally estopped from relitigating this issue as of the date of bankruptcy. See *Russell v. SunAmerica Securities, Inc.*, 962 F.2d 1169 (5th Cir.1992) (court must look at surrounding circumstances to determine if parties have sufficient privity to justify giving prior judgment preclusive effect).

**20.** Using this process, the court in *In re Sullivan*, 161 B.R. 776, 784 (Bankr.N.D.Tex.1993), accepted evidence of insolvency six months before and six months after the transaction in question in order to show insolvency at the time of the transaction. *See also In re Euro–Swiss Int'l Corp.*, 33 B.R. 872, 885–86 (Bankr.S.D.N.Y.1983) (debtor's insolvency three months after a disputed transfer might may create an inference of insolvency at the time of the transfer).

that the promissory note transactions are avoidable under 11 U.S.C. § 548(a)(1). *See* Complaint, at 7–10; *supra* note 6. Also in the alternative, Plaintiff alleges in Counts 4, 8, and 12 that the transactions are avoidable under Texas Business and Commerce Code § 24.005(a)(1). *See* Complaint, at 8–10; *supra* note 7. Under these provisions, the transactions are avoidable if they were transfers the debtor made with the intent to hinder, delay, or defraud the debtor's creditors.

With respect to these claims, Defendants maintain again that the promissory note transactions did not constitute transfers, that Plaintiff has offered only conclusory allegations, and that Plaintiff has not provided adequate summary judgment evidence of any intent on the part of Defendants to hinder, delay, or defraud any of TMHI's creditors.

▪ The Court concludes that Plaintiff may rely on circumstantial evidence from which fraudulent intent may be inferred.[21] *See In re Major Funding Corp.*, 126 B.R. 504, 508 (Bankr.S.D.Tex.1990) ("A finding of requisite intent to make a fraudulent conveyance may be predicated upon a concurrence of facts, while not direct evidence of actual intent, lead to the irresistible conclusion that the transferor's conduct was motivated by such intent"). Under Tex. Bus. & Comm. Code § 24.005(b), in determining whether Defendants, acting for the debtor, had the requisite intent to satisfy Section 24.005(a)(1), a factfinder may consider, *inter alia*, the fact that the transfer was made to an insider; whether the value transferred was reasonably equivalent to the value received by the debtor in exchange; and/or that the debtor was insolvent or became insolvent shortly after the transfer was made.[22] Although Section 24.005(b) refers to the state fraudulent transfer provision, these factors may be used in consideration of Defendants' liability under the federal statute as well. *See In re Sullivan*, 161 B.R. at 780. In the case at bar, the alleged transfers were clearly made to insiders, and, as discussed earlier, Plaintiff has offered sufficient evidence to create fact questions regarding reasonably equivalent value and TMHI's solvency. Therefore, the Court denies Defendants' Motion for Summary Judgment with respect to these claims.

### B. *Payments of Salary and Expenses to Speets and Kellogg*

▪ In Counts 13–24 of the Complaint, Plaintiff claims that Defendants Speets and Kellogg should be liable for a number of allegedly illegitimate salary payments and expense reimbursements they received from TMHI in the final year before it declared bankruptcy. Plaintiff bases these claims on all the statutory provisions described *supra* in Section III.A. and on the voidable preference statute, 11 U.S.C. § 547(b).[23]

**21.** Plaintiff alleges that he has satisfied his summary judgment burden merely by establishing several indicia of fraud and that Defendants now have the burden to prove some legitimate supervening purpose for the note transactions.

**22.** Under Tex. Bus. & Comm.Code § 24.005(b),

In determining actual intent under Subsection (a)(1) of this section, consideration may be given, among other factors, to whether:
(1) the transfer or obligation was to an insider;
(2) the debtor retained possession or control of the property transferred after the transfer;
(3) the transfer or obligation was concealed;
(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(5) the transfer was of substantially all the debtor's assets;
(6) the debtor absconded;
(7) the debtor removed or concealed assets;
(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(10) the transfer occurred shortly before or shortly after a substantial debt was incurred;
(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

**23.** Under 11 U.S.C. § 547(b),

Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made—
(A) on or within 90 days before the date of the filing of the petition; or

The disputed payments include the following:

(1) $134,000 in expense reimbursements and cash withdrawals by Speets sometime after the December 1992 promissory note transactions;

(2) $34,000 in expense reimbursements and cash withdrawals by Kellogg sometime after the December 1992 promissory note transactions;

(3) $100,000 payment to Speets on December 31, 1992;

(4) $27,643.40 payment to Speets on April 7, 1993;

(5) $27,643.40 payment to Kellogg on April 7, 1993.

*See* Complaint, at 3.[24]

Defendants assert that all of these transactions were legitimate business related payments and are therefore protected under 11 U.S.C. § 547(c)(2) (the "ordinary course of business" exception to the bankruptcy statute).[25] Specifically, they claim that payments (1) and (2) above were travel expense and other business related reimbursements and that (4) and (5) were salary advances that only modestly compensated them for their continuing work for TMHI after it filed for bankruptcy and could no longer pay its employees. Defendants do not offer a specific explanation for payment (3). In addition, Defendants repeat the arguments discussed above, namely, that TMHI was not insolvent at the time payments (1), (2), and (3) were made, and that none of the payments were made with any intent to hinder, delay, or defraud any of TMHI's creditors.

 The Court agrees with Plaintiff's contentions that Defendants failed to meet their burden to demonstrate entitlement to summary judgment as to these payments. Defendants have made only conclusory allegations that these payments were all legitimate. As fiduciaries, Speets and Kellogg have the burden to prove the fairness of the challenged transactions to the corporation. *See International Bankers Life Ins. Co. v. Holloway,* 368 S.W.2d 567, 576–77 (Tex. 1963); *In re Jackson,* 141 B.R. 909, 916 (Bankr.N.D.Tex.1992); *Chien v. Chen,* 759 S.W.2d 484, 495 (Tex.App.—Austin 1988, no writ). Moreover, the "ordinary course of business" exception is an affirmative defense and Defendants have not met their burden of showing there are no genuine questions of

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

**24.** Count 13 alleges Speets' liability for payment (1). Count 14 alleges Kellogg's liability for payment (2). Although the Complaint does not specifically state Plaintiff's legal basis to support liability on these counts, for purposes of this Memorandum and Order the Court assumes that Plaintiff intended to allege the same grounds for liability on these counts which he stated for the other allegedly improper payments.

Counts 15–19 alleges Speets' liability for payments (3) and (4). Count 15 invokes 11 U.S.C. § 548(a)(2). Count 16 invokes 11 U.S.C. § 548(a)(1). Count .17 invokes Tex. Bus. and Comm.Code §§ 24.005(a)(2) and 24.006(a). Count 18 invokes Tex. Bus. and Comm.Code §§ 24.005(a)(1). Count 19 invokes 11 U.S.C. § 547(b).

Counts 20–24 alleges Kellogg's liability for payment (5). Count 20 invokes 11 U.S.C. § 548(a)(2). Count 21 invokes 11 U.S.C. § 548(a)(1). Count 22 invokes Tex. Bus. and Comm.Code §§ 24.005(a)(2) and 24.006(a). Count 23 invokes Tex. Bus. and Comm.Code §§ 24.005(a)(1). Count 24 invokes 11 U.S.C. § 547(b).

(As discussed *supra* note 5, Plaintiff used 11 U.S.C. § 548(b)(2) in Counts 15 and 20. However, it appears that he intended to use 11 U.S.C. § 548(a)(2).)

**25.** Under 11 U.S.C. § 547(c),

The trustee may not avoid under this section a transfer—

. . .

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

material fact as to all the elements of this defense. *See* 11 U.S.C. § 547(g) ("party in interest against whom recovery or avoidance is sought has the burden of proving the nonavoidability of a transfer under subsection (c) of this section"); *In re SPW Corp.*, 96 B.R. 683, 685 (Bankr.N.D.Tex.1989). In addition to the material factual issues identified in the preceding sections of this memorandum as to payments (1), (2) and (3), there are questions as to whether payments (4) and (5) above were actually salary advances (since they were made on the eve of TMHI's bankruptcy), whether Defendants had received prior salary payments of similar amounts, whether the payment terms were ordinary, and whether TMHI was obligated at all for such payments. The Court concludes that Plaintiff has established that there are various questions of material fact as to Plaintiff's preference claims under Section 547 and Defendants' defenses to those claims.

### C. *Breach of Corporate Duties*

#### 1. **Plaintiff's Allegations**

In Counts 25, 26, 28, 29, and 33, Plaintiff alleges a number of grounds to support Defendants' liability, which Defendants categorize as "breach of corporate duties" claims. In Count 25, Plaintiff alleges that Defendants engaged in unlawful self-dealing. In Count 26, Plaintiff alleges, in the alternative, that Defendants' actions amounted to "culpable negligence." In Count 28, Plaintiff alleges that in diverting TMHI's funds for the personal benefit of Speets and Kellogg, Defendants usurped corporate opportunities, converted corporate assets, and violated their duties of loyalty and of care to TMHI in their roles as officers, directors, and shareholders. In Count 29, Plaintiff alleges that Defendants breached their duties of loyalty and of care to TMHI by intentionally depriving TMHI of any profit opportunity in its caustic soda transactions with other entities owned by Defendants. In Count 33, Plaintiff alleges that Defendants usurped a corporate opportunity by personally purchasing and profiting from the sale of Pioneer.

In his Amended Response [Doc. # 54], Plaintiff organizes these breach of duty of loyalty claims into four categories of alleged misconduct: Speets and Kellogg's personal acquisition of Chlor Pioneer Alkali, Inc.; their establishment of thirteen foreign distribution companies; personal cash advances from TMHI; and the promissory note transactions discussed *supra* in Section III.A.

#### a. **Pioneer Acquisition**

In 1988, TMHI extended long-term loans of $3 million to Speets and Kellogg to help them acquire Pioneer Chlor–Alkali, Inc., a caustic soda trading company. (Two of the promissory notes described in Section III.A. were replacements for these loans.) TMHI obtained much of the capital to make this loan by borrowing $2 million from Banque Paribas. *See* Promissory Note, Exhibit I to Appendix to Trustee's Amended Response [Doc. # 55]. Although the loans required Speets and Kellogg to make regular interest payments, for four years they paid nothing. According to Plaintiff, TMHI received no benefit from Pioneer's profits, and Speets and Kellogg caused TMHI to enter a disadvantageous contract with Pioneer. Plaintiff also alleges that when Speets and Kellogg sold Pioneer in April 1995, they each profited by $25 million, while TMHI received nothing from these profits.

Plaintiff alleges that the $3 million loan was a misappropriation of TMHI's assets since it was not for legitimate corporate purposes. TMHI, he argues, was a thinly capitalized corporation that should not have been in the business of investment banking, especially on terms under which it seemed unlikely that the loans would ever be repaid. He claims that the loan rendered TMHI unable to pay its debts to suppliers and thus rendered TMHI insolvent. In addition, he argues that the acquisition was a prohibited usurpation of a corporate opportunity because Pioneer was engaged in the same kind of business, chemical trading, as TMHI, and therefore, Speets and Kellogg should have structured the acquisition through TMHI and so as to benefit TMHI, rather than just themselves personally.

In response, Defendants assert that they had legitimate business reasons for taking this opportunity personally rather than through TMHI. Specifically, they claim that, as a Subchapter S corporation, TMHI could

not acquire another corporation, and that it would have been imprudent to subject TMHI to Pioneer's potential environmental liability. In response, Plaintiff argues that a Subchapter S corporation can own 79% of the stock of another corporation, so Defendants could have arranged for TMHI to be at least a part owner, or Defendants could have waived TMHI's Subchapter S status. Also, Plaintiff argues that TMHI would not have been liable for Pioneer's pollution problems.

Plaintiff contends that because Pioneer was engaged in the same general business as TMHI, Speets and Kellogg usurped a corporate opportunity by purchasing Pioneer personally, rather than having TMHI acquire it. Because TMHI was able to loan to Speets and Kellogg the $3 million they used to purchase Pioneer only by borrowing the money from Banque Paribas, Plaintiff contends that, in this transaction, Speets and Kellogg took capital out of TMHI that the company did not actually have and so forced TMHI further into debt in order to support their personal purchase of another corporation.

### b. Foreign Distribution Companies

Plaintiff alleges that, either directly or by funneling funds through Defendant TMH N.V., between 1984 and 1990 Defendants Speets and Kellogg used TMHI funds to establish 13 chemical distribution companies in Central America, South America, Spain, and Germany. Plaintiff claims that Speets and Kellogg own between 50% and 100% of stock in these companies. Defendants deny that they are even stockholders in these companies. Plaintiff claims that, although TMHI was insolvent at the time of the transactions, Defendants used money from TMHI to capitalize these companies and pay their operating expenses.

Plaintiff argues that these transactions were fundamentally unfair to TMHI and detrimental to TMHI's creditors in that they included: no agreement on repayment plans; no agreement requiring the companies to do business with TMHI; no agreement for TMHI to share in the profits of the companies; and no collateral for the loans. Plaintiff contends that Speets and Kellogg did not pursue repayment of any funds advanced to the distribution companies, and even after

one of the companies, Proquimer, an Ecuadorian company, failed in 1991, Defendants continued to extend open credit to the distribution companies in a cavalier manner which it did not use with other companies in which Speets and Kellogg did not have an ownership interest. When TMHI filed for bankruptcy, the distribution companies owed TMHI more than $5.4 million (not counting more than $2 million which Defendants wrote off when Proquimer failed). Plaintiff has been pursuing legal action against these companies but has not succeeded in collecting any of the money owed.

In response to these accusations, Speets and Kellogg argue that they arranged start-up financing for the distribution companies in order to facilitate TMHI's business internationally but that their relationships with these independent entities were conducted through legitimate arm's length transactions.

### c. Personal Cash Advances to Speets and Kellogg

Plaintiff alleges that the payments, discussed *supra* in Section III.B., were fundamentally unfair to TMHI and directly detrimental to TMHI's creditors because the corporation was about to file for bankruptcy. Plaintiff claims that these payments reflect Speets and Kellogg's habit of withdrawing money from TMHI on an "as needed" basis to cover personal expenses.

### d. December 1992 Promissory Note Transactions

As described earlier, Plaintiff claims that these notes put more than $8 million beyond TMHI's reach at a time when the corporation desperately needed this money in order to avoid bankruptcy.

### 2. Speets and Kellogg's Defenses

In addition to Defendants' specific responses, described above, to each of these categories of alleged misconduct, Defendants argue that they should not be held liable under any of these counts because (1) they were TMHI's sole shareholders and sole directors and (2) as corporate directors, at least with respect to the Count 26 charge of negligence, they are entitled to a presumption of validity and good faith under the business judgment rule.

#### a. Sole Shareholders and Sole Directors Argument

■ Defendants argue that corporate directors owe their duties of loyalty and care to shareholders, and since they were TMHI's sole shareholders, their only corporate duties were to themselves. Therefore, they claim they cannot be liable for breach of corporate duties since all of their transactions were obviously for their own benefit. In addition, Defendants argue that the corporate opportunity doctrine is a "rule of disclosure" which prohibits directors from taking an opportunity for themselves without first disclosing the opportunity to the board and giving the corporation the chance to take the opportunity itself. Because Speets and Kellogg were, until May 1992, the corporation's only directors, Defendants argue therefore that they cannot be liable under the corporate opportunity doctrine. As the directors, they naturally were aware of their own activities, and thus the board can be understood to have "ratified" their transactions.[26]

■ In contrast, Plaintiff argues that although in Texas the corporate opportunity doctrine may be a "rule of disclosure" as Defendants contend, in Delaware, the state of TMHI's incorporation after 1991, it is instead a "rule of fairness."[27] Plaintiff claims

that Defendants have not rebutted the presumption of unfairness that arises from their involvement in interested party transactions that hurt TMHI. The Court agrees that Delaware law imposes a rule of fairness. In *Kahn v. Lynch Communication Systems, Inc.,* 638 A.2d 1110, 1115, 1117 (Del.1994), the Delaware Supreme Court held that:

> A controlling or dominating shareholder standing on both sides of a transaction ... bears the burden of proving its entire fairness ... [E]ven when an interested ... transaction receives the informed approval of a majority of minority stockholders or an independent committee of disinterested directors, an entire fairness analysis is the only proper standard of judicial review.[28]

However, the Court is not persuaded that in Texas the corporate opportunity doctrine is only a "rule of disclosure." Under Texas law, usurpation of a corporate opportunity occurs

> when an officer or director misappropriates a business opportunity that properly belongs to the corporation. It arises where a corporation has a legitimate interest or expectancy in, and financial resources to take advantage of, a particular business opportunity.... Whether or not a corporate interest exists depends upon

---

**26.** Plaintiff claims that the directors who were added to the board in May 1992 served at the discretion of Speets and Kellogg, and thus "[a] legitimate question exists ... as to whether these directors were independent." *See* Weaver Supplemental Affidavit, Exhibit 6 to Appendix to Trustee's Amended Response [Doc. # 55], ¶ 12.

**27.** The parties argue at length about whether and when to apply Delaware law and Texas law. Defendants concede that even if Delaware law applies to events that occurred after December 31, 1991, Texas law should apply to events that occurred before TMHI's reincorporation in Delaware. The Court agrees that the law of the state of incorporation determines the duties of directors and shareholders. *See* Tex. Bus. Corp. Act. Ann. art. 8.02 ("[O]nly the laws of the jurisdiction of incorporation of a foreign corporation shall govern ... the internal affairs of the foreign corporation, including but not limited to the rights, powers, and duties of its board of directors").

Because Plaintiff alleges that Defendants breached their corporate duties not only in the acquisition of Pioneer and the establishment of the foreign distribution companies, which occurred

when TMHI was incorporated in Texas, but also in their subsequent transactions between these entities and TMHI, which includes the period when TMHI was incorporated in Delaware, Plaintiff's Complaint implicates the laws of both Delaware and Texas with respect to the breach of corporate duties claims. Since the Court determines, in the following analysis, that there is no significant difference between Delaware and Texas law with respect to the alleged breach of corporate duties, it is not necessary at this time to conduct a detailed analysis regarding which law controls each transaction.

**28.** Ratification of the transaction may, however, affect the parties' burden of proof:

> The initial burden of establishing entire fairness rests upon the party who stands on both sides of the transaction. However, an approval of the transaction by an independent committee of directors or an informed majority of minority shareholders shifts the burden of proof on the issue of fairness from the controlling or dominating shareholder to the challenging shareholder-plaintiff.

*Kahn,* 638 A.2d at 1117.

the facts and circumstances of the particular case.

*Alexander v. Sturkie*, 909 S.W.2d 166, 169–70 (Tex.App.—Houston [14th Dist.] 1995) (citations omitted). *See also UTAIC v. MacKeen & Bailey, Inc.*, 99 F.3d 645 (5th Cir.1996). Faced with an issue of first impression in Texas, the *Alexander* court surveyed the corporate opportunity doctrine from other jurisdictions. Its analysis gives no indication that a director is immune from a charge of usurpation of a corporate opportunity merely because that opportunity was disclosed to the board. Also, in *General Dynamics v. Torres*, 915 S.W.2d 45 (Tex.App.—El Paso 1995), in considering a breach of corporate opportunity claim, the court stated that:

> Necessary, but not exclusive, factors to be considered in determining inherent fairness and good faith of an interested transaction are adequacy of consideration, the degree to which the officer represented the corporation, *the disclosure to and knowledge of the full board of directors or shareholders,* and the necessity of the transaction to the corporation.

*Id.* at 49 (emphasis added). Thus, according to the *General Dynamics* court, disclosure is merely *one* factor, and not the sole factor, in determining whether an officer usurped a corporate opportunity.

■ It appears, therefore, that under both Texas and Delaware law, the determination of whether a director is liable for usurpation of a corporate opportunity requires a fact-based inquiry into the nature of the disputed transactions. This inquiry is for a factfinder, and not for the Court's determination on motions for summary judgment.

As for the corporate duties of loyalty and care, Plaintiff contends that Defendants' ratification argument is without merit because Defendants did not actually formally ratify or waive their breaches of duty; Defendants would not, in any case, have had the right to waive the rights of TMHI's creditors; ratification applies only where a company accepts a benefit conferred on it, not when an insider uses it as a defense against allegations of self-dealing; and, even if ratification does apply, it does not extinguish Plaintiff's claim for breach of loyalty, but instead merely shifts the burden to Plaintiff to prove that the disputed transactions were actually unfair.

Defendants respond that ratification is not an issue here because corporate formalities are not required when all of the shareholders take part in a transaction. In support of their argument, Defendants cite *Matter of Safety International, Inc.*, 775 F.2d 660 (5th Cir.1985), in which the court accepted a defendant's argument that he could not be liable for an alleged breach of fiduciary duty (in this case, a usurpation of a corporate opportunity) because he and his codefendant owned all of the corporation's stock and therefore, as sole shareholders, they waived any cause of action by implicitly ratifying the transaction. However, *Safety International* is distinguishable because, in that case, the court reached the factual conclusions that no creditors' rights were violated, the corporation was solvent at the time of the challenged transaction, the transaction was not in any way related to the corporation's subsequent Chapter 11 filing, and the bankruptcy court found no evidence of fraud. The Court held that had the transaction been made to defraud creditors, made while the corporation was insolvent, or otherwise made in violation of a statute or public policy, then the district court could have imposed a constructive trust on the defendant's allegedly usurped purchase option. *See id.*, at 662.[29]

At the heart of the parties' dispute at bar, Plaintiff points out that Speets and Kellogg, as sole directors and sole shareholders, owed fiduciary duties not only to TMHI's shareholders, but also to the corporation itself and to its creditors. In reply, Defendants argue

---

**29.** *See also General Dynamics v. Torres*, 915 S.W.2d at 50–51 ("there can be no ratification of 'an act which is not done in behalf of....' the corporation. '[R]atification can only be effectual between the parties involved when the [fiduciaries'] act is done openly and admittedly for the [corporation], and not when done for the [fidu-

ciaries'] expressed benefit.' ... [T]he rule in Texas [is] that ratification is not available to condone a corporate officer or director's disloyalty or fraud") (quoting *Herider Farms–El Paso, Inc. v. Criswell*, 519 S.W.2d 473, 477–78 (Tex. Civ.App.—El Paso 1975, writ ref'd n.r.e.)).

that directors do not owe fiduciary duties to creditors unless the corporation is insolvent. Defendants rely on *Geyer v. Ingersoll Publications Company*, 621 A.2d 784 (Del.Ch. 1992), which they interpret to require a strict showing by Plaintiff of TMHI's insolvency at the time of each of the disputed transactions. However, in *Geyer*, the court stated that "the general rule is that directors do not owe creditors duties beyond the relevant contractual terms absent special circumstances ... e.g., fraud, insolvency, or a violation of a statute," *id.*, at 787 (internal quotations omitted). Although Defendants urge that *Geyer* creates a single narrow exception for insolvency, this quotation makes clear and the Court is persuaded that insolvency is only *one example* of a circumstance in which directors owe fiduciary duties to creditors.[30] Plaintiff argues that this exception to the general rule is broad enough to create a fiduciary duty to creditors when the corporation is in "the vicinity of insolvency," not just when the corporation is actually insolvent,[31] *see Credit Lyonnais Bank Nederland v.*

*Pathe Communications Corp.*, 1991 WL 277613, at 34 (Del.Ch.1991),[32] *cited in Geyer*, 621 A.2d at 789; *Jewel Recovery, L.P. v. Gordon*, 196 B.R. 348 (N.D.Tex.1996)[33] or when a transaction results in prejudice to those creditors, *see In re Jackson*, 141 B.R. 909. The *Jackson* court explained that:

> The imposition of a fiduciary obligation on a dominant or controlling stockholder or stockholders is not just for the protection of the corporation or its other stockholders, but extends to corporate creditors as well. *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939). However, "the rights of creditors are involved only where there has been prejudice to the creditors, and prejudice arises only where the transaction is a fraudulent conveyance or one which led to corporate insolvency." *Martin v. Kagan (In re Tufts Electronics, Inc.)*, 746 F.2d 915, 917 (1st Cir.1984).

*Id.* at 915.

▬▬ Thus, it appears that under both Delaware law and Texas law, corporate insid-

---

**30.** Defendants note that the *Geyer* court held that "the insolvency exception arises upon the fact of insolvency." 621 A.2d at 789. However, when understood in context, this quotation does not support Defendants' position. The sentence from which Defendants selectively quote states that "the insolvency exception arises upon the fact of insolvency *rather than the institution of statutory proceedings*," *id.* (emphasis added). Thus, the court made this statement in the context of its decision that in order for a plaintiff to invoke the insolvency exception, it is not necessary for the corporation to have actually declared bankruptcy. In this statement, the court was merely rejecting one narrow interpretation of insolvency; it was not limiting its earlier description, quoted above in the text, of the circumstances in which directors owe fiduciary duties to creditors.

**31.** Thus, Plaintiff claims he has an easier burden to prove insolvency or near-insolvency with respect to the corporate duty claims than with respect to the statutory bankruptcy avoidance claims.

**32.** In *Credit Lyonnais*, a case involving "differing interests between the corporation and its 98% shareholder," the court stated that: "At least where a corporation is operating in the vicinity of insolvency, a board of directors is not merely the agent of the residue risk bearers, but owes its duty to the corporate enterprise." *Credit Lyonnais*, 1991 WL 277613, at 34. The court explained further that "The possibility of insolvency can do curious things to incentives, exposing

creditors to risks of opportunistic behavior and creating complexities for directors." *Id.*, at 36 n. 55. After examining a hypothetical dilemma for directors in this situation, the court concluded that the correct result

> will not be reached by a director who thinks he owes duties directly to shareholders only. It will be reached by directors who are capable of conceiving of the corporation as a legal and economic entity. Such directors will recognize that in managing the business affairs of a solvent corporation in the vicinity of insolvency, circumstances may arise when the right (both the efficient and the fair) course to follow for the corporation may diverge from the choice that the stockholders (or the creditors, or the employees, or any single group interested in the corporation) would make if given the opportunity to act.

*Id.*

**33.** In *Jewel Recovery*, the court stated that under Delaware law,

> when a corporation becomes insolvent ... [t]he corporate directors then hold a fiduciary duty as trustees to protect the assets for the creditors .... Delaware may have expanded this duty, as distinguished from the directors' fiduciary duty to the corporation, when the corporation operates within a *zone of insolvency*.

*Jewel Recovery*, 196 B.R. at 354 (citing *Geyer* and *In re Buckhead America Corp.*, 178 B.R. 956, 968–69 (D.Del.1994)) (emphasis added).

ers, such as Speets and Kellogg, may have a fiduciary duty to the corporation's creditors even when the corporation was not insolvent. The Court holds that Plaintiff may therefore prevail on his breach of corporate duty claims if he shows, for each allegedly wrongful transaction, that TMHI was, at the time, in "the vicinity of insolvency," *see Credit Lyonnais, supra;* that the transaction led to TMHI's insolvency; or that the transaction was a fraudulent conveyance, as defined by the federal and state statutes discussed *supra* in Section III.A., *see Jackson, supra.* Because the existence or absence of Defendants' fiduciary duty to TMHI's creditors depends upon resolution of these factual issues, the Court cannot determine as a matter of law whether Defendants' status as sole shareholders render them immune from liability for Plaintiff's breach of corporate duty claims.[34]

### b. Business Judgment Rule

■ Defendants argue that they cannot be adjudged negligent for their transactions because, under the business judgment rule, corporate directors are entitled to a presumption of validity and good faith in their actions affecting the corporation. They also deny that they committed any negligent acts.

■ Defendants are correct that the business judgment rule bars claims for simple negligence for breach of corporate directors' duty of care. *See, e.g., F.D.I.C. v. Benson,* 867 F.Supp. 512, 523 (S.D.Tex.1994). However, the rule does not bar claims for gross negligence. *See id.; F.D.I.C. v. Schreiner,* 892 F.Supp. 869, 880–82

(W.D.Tex.1995). Texas law defines gross negligence as follows:

> (1) viewed objectively from the standpoint of the actor, the act or omission must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and (2) the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed ·in conscious indifference to the rights, safety, or welfare of others.

*Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10 (Tex.1994). Plaintiff has offered sufficient evidence to support a finding that Defendants' breach of their corporate duties constituted gross negligence.[35] Therefore, the Court declines to grant summary judgment to Defendants on Plaintiff's negligence claim insofar as Plaintiff alleges Defendants were grossly negligent in their actions with respect to TMHI.[36]

### D. Alter Ego Doctrine

■ In Count 27, Plaintiff claims that Defendants used the distribution companies, described *supra* in Section III.C.1.b., as sham devices to disadvantage the creditors of TMHI and that therefore the corporate veil of the distribution companies should be pierced and that Speets and Kellogg should be held personally liable for all amounts which they caused TMHI to advance to the distribution companies. In Counts 30 and 31, Plaintiff claims that Speets and Kellogg used the *distribution companies* and TMH N.V. as a single business entity for their own financial gain and that therefore their corporate shells should be disregarded so as to hold Speets and Kellogg liable for all the debts owed to creditors by TMHI.[37] In

---

34. Plaintiff characterizes Defendants' sole shareholders argument as an affirmative defense, but Defendants insist that the argument is merely relevant to the question of whether they owed any fiduciary duties to TMHI's creditors and that raising the argument does not shift any burden of proof to them. The cited authorities suggest that the sole shareholders argument is not an affirmative defense. However, regardless of who bears the burden of proof, there is sufficient evidence to create questions of fact on this issue.

35. For instance, Defendants caused TMHI to renegotiate their promissory notes to eliminate annual interest payments and lower the interest rates, which precluded the company from accel-

erating notes that already were in default at a time when certain suppliers could not be paid in full.

36. In Count 26 of the Complaint, Plaintiff alleges that Defendants are liable for "culpable negligence." Since Plaintiff has offered sufficient evidence to support a claim for gross negligence, the Court will not grant summary judgment on this claim merely because Plaintiff used the word "culpable" rather than "gross."

37. Apparently in error, this charge is repeated verbatim in Counts 30 and 31.

Count 32, Plaintiff claims that Speets and Kellogg used TMHI as a sham to perpetrate a fraud on TMHI's creditors and that therefore its corporate fiction should be disregarded so as to hold Speets and Kellogg liable for all the obligations owed by TMHI to its creditors.

Thus, Plaintiff seeks to use the alter ego doctrine to hold Speets and Kellogg personally liable for (1) all amounts advanced by TMHI to TMH N.V. and the distribution companies and (2) all debts owed by TMHI to its creditors.

Defendants argue that in order to pierce the corporate veil under the alter ego doctrine, Plaintiff must prove actual fraud, which he has failed to do. In addition, Speets and Kellogg argue that the alter ego doctrine cannot apply to the foreign distribution companies because Speets and Kellogg are not even stockholders in these companies. In response, Plaintiff argues that although Texas law requires proof of actual fraud in order to pierce a corporate veil, *see Thrift v. Hubbard*, 44 F.3d 348, 353 (5th Cir.1995) ("Proving that a corporation is the alter ego of a shareholder alone is not enough; in order to pierce the corporate veil, the obligee must also demonstrate fraud by and direct personal benefit to the obligor"),[38] under the applicable Delaware law, a court may pierce a corporate veil without proof of fraud or illegality where "equitable considerations" require it.

■■■■ Plaintiff is correct that Delaware law does not require a finding of fraud. Instead, in determining whether to allow veil piercing under Delaware law, a court may look to the following factors: whether a corporation was adequately capitalized and sol-

vent; whether corporate formalities were followed, including payment of dividends and upkeep of corporate records; whether the dominant shareholders siphoned corporate funds; and whether the corporation is a facade for the dominant shareholders. *See Alberto v. Diversified Group, Inc.*, 55 F.3d 201, 205 (5th Cir.1995) (quoting *Harco Nat'l. Ins. Co. v. Green Farms, Inc.*, No. 1131, 1989 WL 110537, 5 (Del.Ch. Sept. 19, 1989)). *See also Geyer v. Ingersoll Publications Company*, 621 A.2d at 793 ("a court can pierce the corporate veil of an entity where there is fraud *or* where a subsidiary is in fact a mere instrumentality or alter ego of its owner") (emphasis added).

■■■■ In determining whether to apply the Texas or the Delaware alter ego doctrine, and thus whether to require Plaintiff to prove actual fraud, the Court must apply the choice of law rule of Texas, the forum state. *See Alberto*, 55 F.3d at 203; *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under the Texas choice of law rule, shareholder liability is determined by the law of the state of incorporation. *See Alberto*, 55 F.3d at 203.[39] In the case at bar, this analysis is complicated by the fact that TMHI was originally a Texas corporation but was reincorporated in Delaware on December 31, 1991. Applying the Texas choice of law rule, the Court concludes that, with respect to Plaintiff's attempt to pierce the corporate veil of TMHI, each challenged act must be evaluated under the law of the State of TMHI's incorporation at the time of the act. Thus, all of Defendants' challenged acts which occurred prior to December 31, 1991, will be evaluated under Texas law and all acts which occurred later will be considered under Delaware law.[40]

---

**38.** *Thrift* relied on Tex. Bus. Corp. Act Ann. art. 2.21(A), which provides that:

A holder of shares ... shall be under no obligation to the corporation or to its obligees with respect to ... (2) any contractual obligation of the corporation on the basis that the holder, owner, or subscriber is or was the alter ego of the corporation, ... unless the obligee demonstrates that the holder, owner or subscriber caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, owner, or subscriber....

**39.** *Alberto* relies on Tex. Bus. Corp. Act. Ann. art. 8.02, which provides that:

[O]nly the laws of the jurisdiction of incorporation of a foreign corporation shall govern ... (2) the liability, if any, of shareholders of the foreign corporation for the debts, liabilities, and obligations of the foreign corporation for which they are not otherwise liable by statute or agreement.

**40.** This analysis is further complicated by the fact that Plaintiff seeks also to pierce the corporate veil of TMH N.V. (which was incorporated in the Netherlands Antilles) and the corporate

For reasons discussed *supra*, the Court finds that Plaintiff has established there are numerous questions of material fact as to whether, under both Texas and Delaware law, TMHI was the alter ego of Defendants at various times. Therefore, summary judgment in favor of Defendants as to alter ego issues is not warranted.

### E. Conspiracy

In Count 34, Plaintiff alleges that Speets and Kellogg made all the transfers of money from TMHI alleged in this action in conspiracy with one another and that therefore the two should be held jointly and severally liable for all sums adjudged against either. Defendants argue that Plaintiff has not adequately proven the elements of civil conspiracy. In response, Plaintiff contends that civil conspiracy does not require that the conspirators be aware of their conduct's illegality, only that they intended to cooperate in the conduct for which at least one is found liable.

The Court concludes that this case is governed by *Triplex Communications, Inc. v. Riley,* 900 S.W.2d 716, 719 (Tex.1995), in which the Texas Supreme Court ruled that civil conspiracy requires specific intent: "For a civil conspiracy to arise, the parties must be aware of the harm or wrongful conduct at the inception of the combination or agreement." This standard requires proof at a trial. The issues of when the agreement began and whether Defendants were aware of their actions causing harm to TMHI are genuine questions of fact for a jury.

### F. Punitive Damages

In Count 35, Plaintiff claims that Defendants' breaches of their corporate duties were intentional and willful and that therefore Speets and Kellogg should be liable for punitive damages. Again, Defendants deny that Plaintiff has proven any intentional breaches, to which Plaintiff responds that intent can be inferred from circumstantial evidence. The Court declines to grant summary judgment on punitive damage issues at this time on this record. Whether a punitive damages issue will go to the jury is a matter that will be addressed after the evidence has been presented at trial.

### G. Statute of Limitations

As an affirmative defense, Defendants argue that Counts 25, 26, 28, 29, 33, and 35 are barred by the Texas statute of limitations because those claims involve Defendants' purchase of Pioneer, which occurred in 1988, and Defendants' creation of the foreign distribution companies between 1984 and 1990. The Texas statute of limitations for breach of fiduciary duty and for negligence is two years. *See* Tex.Civ.Prac. & Rem.Code Ann. § 16.003(a).[41]

In response, Plaintiff argues that commencement of the two-year limitations period should be tolled by the "adverse domination rule." Under this rule, the statute of limitations is tolled for the period of time in which a majority of a corporation's board is composed of alleged wrongdoers. *See Resolution Trust Corp. v. Acton,* 49 F.3d 1086, 1090 (5th Cir.1995). Plaintiff contends that because Defendants were the sole corporate directors for the period during which the disputed transactions occurred and up until May 1992 and because Defendants continued to dominate the board after May 1992 for the

---

veils of all the foreign distribution companies (which were incorporated in a variety of countries throughout Latin America and Europe). As explained above, such veil piercing would require an evaluation of each challenged act under the law of the country of incorporation for each corporation. The parties have not briefed this exhaustive analysis. Defendants have not demonstrated that, as a matter of law, Plaintiff may not pierce the corporate veils of these other entities. The Court therefore does not reach the veil piercing issues as to the Defendants' affiliated companies on the pending motions for summary judgment.

41. Because the Texas statute of limitations applies to these claims, *see Sun Oil Co. v. Wortman,* 486 U.S. 717, 108 S.Ct. 2117, 100 L.Ed.2d 743 (1988) (court may apply forum State statute of limitations even to claims governed by law of a different State), the Court will apply the Texas adverse domination rule. Under *F.D.I.C. v. Dawson,* 4 F.3d 1303, 1309 (5th Cir.1993), *cert. denied,* 512 U.S. 1205, 114 S.Ct. 2673, 129 L.Ed.2d 809 (1994), the Court must consider the state law of adverse domination when it applies a state statute of limitations.

duration of TMHI's pre-bankruptcy existence (until April 1993), which was less than two years before Plaintiff filed this action, none of the claims in the Complaint are time-barred. *See also* 11 U.S.C. § 108 (debtor may commence an action that is not time-barred on the date the bankruptcy petition is filed on or before the later of two years after an order for relief is entered or the expiration of such limitations period, including any suspension of such period occurring upon commencement of the bankruptcy case).

 Defendants are correct in their assertion that, under Texas law, in order to invoke the adverse domination rule Plaintiff must prove that Speets and Kellogg were not merely negligent, but instead were "active participants in wrongdoing or fraud." *Id.* at 1090–92. However, in this case Plaintiff has clearly alleged and offered substantial evidence to support his allegations that Defendants' conduct rose above the level of negligence to constitute wrongful self-dealing or even fraud. Therefore, the Court denies Defendants' Motion for Summary Judgment as to statute of limitations issues and will allow the jury to consider whether the adverse domination rule applies so as to bar Defendants' liability for their conduct prior to October 1992.

## IV. *PLAINTIFF'S CROSS–MOTION FOR PARTIAL SUMMARY JUDGMENT*

In his Cross–Motion, Plaintiff attempts to narrow the issues in the case by urging the Court to accept his argument regarding two issues which cut across a number of his claims: (1) whether Speets and Kellogg should be insulated from liability because of the fact that they were sole shareholders of TMHI; and (2) whether TMHI was insolvent during the relevant periods of time. For

reasons discussed above in Sections III.C.2.a. and III.A.2.a.(iii)(a), the Court concludes that the issues require resolution of fact questions that cannot be made through summary judgment. Plaintiff's Cross–Motion is therefore denied.

## V. *MOTIONS TO STRIKE*

### A. *Defendants' Motion to Strike Affidavits of Weaver, Deweese, and Chernow [Doc. # 61]*

#### 1. Weaver

 Plaintiff Weaver has offered two affidavits, a report affidavit and a supplemental affidavit, regarding TMHI's financial condition at various points of time. *See* Exhibits 4 and 6 to Appendix to Trustee's Amended Response [Doc. # 55]. Defendants argue that before he was appointed trustee in March 1994, Weaver had no personal knowledge regarding the issues underlying this case and therefore all of his factual testimony regarding prior events is hearsay, that he is not qualified as an expert to testify on the financial condition of TMHI, that his conclusions lack factual basis or reasoning, and that his report affidavit does not adhere to traditional accounting principles since he uses a speculative methodology.[42] These objections are without merit. The evidence presented demonstrates that Weaver possesses vast oil company, business, and accounting experience over more than 30 years. In addition, his report contains a summary of opinions based on adequate reasoning. Defendants' criticisms relate to the weight to which the opinions are entitled—a matter for a finder of fact, not the Court to consider.[43]

#### 2. Deweese

This affidavit, *see* Exhibit 5 to Appendix to Trustee's Amended Response [Doc. # 55],

---

42. Defendants also argue that Weaver's supplemental affidavit contains new opinions not revealed timely in reports filed pursuant to expert witness disclosures or discovery responses and contains documents that he refused to disclose during his deposition taken the day before the affidavit was executed. Plaintiff, on the other hand, claims that Defendants inspected these documents in full and that the documents were actually in the room when Weaver's deposition was taken. Nevertheless, it appears that Defendants have not sought a further deposition from

Weaver. If Defendants so request, Weaver shall be presented promptly for a further deposition on the opinions in his supplemental affidavit.

43. In addition, Defendants have not produced facts to demonstrate that Weaver's analysis, methodology, or manner of reaching conclusions is inconsistent with accepted practices of business or accounting in the fields to which he refers.

also contains opinions as to TMHI's financial condition at various points in time. Defendants argue that the affidavit does not establish Deweese's expert qualifications, that Deweese conducted a liquidation analysis using hindsight and not "going concern" valuation, that he provides no factual basis or indication of the reasoning he used, that the accounting is not grounded in well-founded methodology, that his opinions are based on inferences from documents rather than expertise, and that they assume unsupported facts. Because the Court has not relied on Deweese's opinions in reaching the conclusions herein, Defendants' Motion to Strike Deweese's Affidavit is denied as moot. The Court notes, however, that most of Defendants' criticisms go to the weight Deweese's opinions should be accorded, not their admissibility.[44]

### 3. Chernow

As mentioned earlier, Plaintiff claims that in this affidavit, see Exhibit 3 to Appendix to Trustee's Amended Response [Doc. # 55], Chernow included a "going concern" analysis. However, Defendants contend that Chernow was designated only as a rebuttal witness and therefore may not testify in Plaintiff's case-in-chief, and that they have the right, during trial, to move for a directed verdict before Plaintiff could offer Chernow's testimony. Defendants also argue that Chernow's affidavit does not establish his qualifications, that his opinions are speculative, that they are based on unsupported facts and inferences, and that they do not explain his reasoning process. Defendants also argue that Chernow's claim that TMHI was insolvent from 1986 to 1993 is absurd because the corporation obviously could not have survived and prospered as it did for so long if it had been insolvent for that entire period of time. Again, the argu-

ments on the merits of Chernow's opinions and alleged lack of reasoning go to the weight they should be accorded by a jury; they are not grounds to strike his affidavit. As to the timing of Chernow's testimony at trial, the Court will address the matter in due course in connection with motions in limine.[45]

### B. Plaintiff's Motion to Strike Supplemental Affidavits of Defendants [Doc. # 81]

Plaintiff has moved to strike the supplemental affidavits offered by Speets and Kellogg, see Exhibits 1 and 2 to Defendants' Response to Plaintiff's Cross–Motion for Summary Judgment [Doc. # 79], on the grounds that their testimony is conclusory, self-serving, and not supported by the evidence, and that they are not qualified as experts to testify about TMHI's solvency. In addition, Plaintiff has moved to strike a supplemental affidavit offered by Wayne McConnell, see Exhibit 3 to Defendants' Response to Plaintiff's Cross–Motion for Summary Judgment [Doc. # 79], an accountant who conducted audits of TMHI's finances, on the ground that he is not qualified as an expert.

In response, Defendants argue that the fact that a party's testimony is self-serving is not a basis for striking it as evidence, that the affidavits are supported by evidence, and that the witnesses are all qualified as experts. The Court concludes the Plaintiff's Motion to Strike will be denied for the same reasons as Defendants' Motion to Strike has been denied herein.

## VI. CONCLUSION

For the foregoing reasons, it is **ORDERED** that **Defendants' Motion for Sum-**

---

**44.** As to Deweese's use of liquidation values, however, the Court deems his testimony irrelevant in light of the foregoing rulings. The Court concurs with Defendants that liquidation analysis is inappropriate. Deweese's conclusions in that regard will not be received in evidence at trial. If Plaintiff intends to use Deweese's testimony at trial, Deweese must revise his report to eliminate liquidation values. If he revises his analysis, he must be produced for deposition within 21 days of entry of this Order.

**45.** The Court notes that Defendants had ample notice regarding Plaintiff's intent to use this expert and could have deposed him before the close of discovery. Plaintiff filed his designation of Chernow as an expert witness on March 11, 1996, see Exhibit 3 to Trustee's Response to Defendants' Reply [Doc. # 64], and the discovery cutoff deadline was June 30, 1996.

mary Judgment or, in the Alternative, Partial Summary Judgment ("Motion") [Doc. # 36] is **DENIED.** It is further

**ORDERED** that Plaintiff's Cross–Motion for Partial Summary Judgment ("Cross–Motion") [Doc. # 65] is **DENIED.** It is further

**ORDERED** that Defendants' Motion to Strike Affidavits of Weaver, Deweese, and Chernow [Doc. # 61] is **DENIED.** It is further

**ORDERED** that Plaintiff's Motion to Strike and Objection to Supplemental Affidavits of Defendants [Doc. # 81] is **DENIED.**